Evelyn V. Keyes, Justice *204 In this case arising out of a dispute between a well operator and suppliers of goods and services, the suppliers, appellees Precision Energy Services, Inc., Weatherford International Inc., Weatherford US LP, Weatherford Laboratories Inc., and Weatherford Artificial Lift System LLC (collectively, "Weatherford"), sued Amerril Energy, LLC, the well operator and a limited liability company, for breach of contract, fraud, declaratory relief, and foreclosure of a mineral lien. Weatherford sought to pierce the corporate veil of Amerril and hold appellant U.S. KingKing, LLC, likewise a limited liability company and a member of Amerril, liable for Amerril's obligations under an alter-ego theory. The trial court granted summary judgment in favor of Weatherford, ruling that Amerril had breached its contracts with Weatherford, that Amerril was the alter ego of KingKing, and that Amerril and KingKing were jointly and severally liable to Weatherford. The trial court also awarded Weatherford attorney's fees and collection costs, entered declaratory relief in favor of Weatherford, and ruled that Weatherford was entitled to foreclosure on its mineral lien.
In six issues on appeal, KingKing contends that (1) the trial court erred in rendering summary judgment because Weatherford did not conclusively establish that Amerril was KingKing's alter ego; (2) the trial court properly dismissed Weatherford's fraud claims and therefore those claims cannot serve as the basis for the judgment; (3) the trial court erred in awarding declaratory relief against KingKing; (4) the trial court erred in granting foreclosure against KingKing because KingKing did not own the property subject to Weatherford's mineral lien; (5) the trial court erred in awarding attorney's fees against KingKing; and (6) the trial court abused its discretion by failing to grant KingKing's motion for new trial.
We reverse and remand.
Background
A. Relationship Between the Parties
Amerril is a limited liability company involved in oil and gas exploration, and it owns and operates mineral interests located throughout Texas. KingKing, likewise a limited liability company, is the United States branch of a Chinese corporation, and one of the members of Amerril. Ping He is the president of both Amerril and KingKing. The Weatherford companies are involved in the sale and rental of oilfield equipment and provide related services. Weatherford International, Inc. is a corporation with multiple subsidiaries, four of which were involved in providing goods and services in this case: Precision Energy Services, Inc., Weatherford US LP, Weatherford Laboratories Inc., and Weatherford Artificial Lift System LLC.
In early 2013, KingKing was the leaseholder and Amerril was the operator of the Seale 1H well ("the Well") located in Leon County, Texas. A company called Sun Delta, Inc. also owned an interest in the Well.[1] Amerril required goods and services to assist in drilling the Well, and its engineers identified Weatherford as a company that could provide these goods and services. On January 29, 2013, Jacque Bateman, the former accounting manager for Amerril, signed a "Confidential Credit Account Application with Terms and Conditions"
*205 ("the Agreement") on behalf of Amerril, seeking a line of credit with Weatherford to obtain oilfield goods and services. Amerril attached an information sheet to its application that identified KingKing as Amerril's "principal owner" and provided credit references. Ultimately, Weatherford agreed to provide goods and services to Amerril for the Well.
B. The Well Breaks Down and Amerril Fails to Pay Weatherford
The materials that Weatherford provided for the Well included cement plugs used in fracturing the Well and a mud motor used in drilling operators. Around April 2013, the plugs and the mud motor allegedly failed, causing a delay in drilling operations and damage to the Well. Weatherford continued providing labor and materials to Amerril, but Amerril allegedly failed to pay multiple invoices from each of the Weatherford entities that provided goods and services.
On August 9, 2013, Weatherford filed an affidavit in the Leon County property records claiming a lien "for labor performed and materials furnished as a contractor under express contract with the mineral property owner, mineral contractor and/or mineral subcontractor." This affidavit listed the mineral property owners as Amerril, KingKing, and Sun Delta and stated that Weatherford had performed labor and furnished materials at the request of Amerril. The affidavit reflected that Precision Energy Services claimed $122,727.39 for six unpaid invoices, Weatherford U.S. claimed $364,625.35 for nine unpaid invoices, and Weatherford Artificial Lift Systems claimed $5,611,417.73 for thirty-one unpaid invoices. Weatherford claimed a total outstanding amount of $6,098,770.47 in damages.
C. The Parties File Suit
Shortly after Weatherford filed its lien affidavit, the parties began asserting claims against each other, beginning with Precision Energy Services' suing Amerril for breach of contract and to foreclose its mineral lien. While that suit was pending, KingKing assigned its interests in the Well to Amerril. Several suits were filed in both Harris County and Leon County,[2] and ultimately the Harris County trial court realigned the parties with Amerril, KingKing, and Sun Delta as plaintiffs and the Weatherford entities as defendants.
In its live pleading, Amerril asserted a claim against Weatherford for breach of contract and breach of express and implied warranties arising out of the alleged failure of the cement plugs and mud motor that Weatherford had provided for the Well. All three plaintiffs-Amerril, KingKing, and Sun Delta-asserted claims against Weatherford for strict products liability and negligence. The plaintiffs also asserted alternative causes of action against multiple third parties to the extent Weatherford had designated them as responsible third parties for manufacturing the allegedly defective products.[3]
In its live pleading, Weatherford alleged that it had requested that Amerril provide it with information concerning its financial condition before Weatherford would extend credit. It alleged that, in response, Amerril submitted a document entitled *206 "US KingKing Petroleum Operation Consolidated Balance Sheet, As of December 31, 2012" that purportedly overvalued its 2012 net income by almost $20 million. Weatherford alleged that it relied upon this balance sheet in deciding to issue credit to Amerril.
Weatherford asserted breach of contract claims against Amerril, alleging that Amerril failed to pay invoices for goods and services provided for the Well.[4] Weatherford also alleged that, in the Agreement, Amerril agreed to defend and indemnify Weatherford against claims brought against it by third parties, including KingKing and Sun Delta, and that Amerril breached the Agreement by failing to defend and indemnify Weatherford. Weatherford also asserted breach of contract claims against KingKing, alleging that KingKing was liable for Amerril's contractual obligations to Weatherford pursuant to Business Organizations Code section 21.223 because Amerril was an alter ego of KingKing. Weatherford alleged that KingKing used Amerril to perpetrate an actual fraud on Weatherford by "purposefully creating Amerril as a shell entity with no control of any funds with which to pay Weatherford and by failing to disclose the extent of KingKing's control at the time of contracting and throughout the course of this lawsuit."
Weatherford also sought declaratory relief against all three plaintiffs. Specifically, Weatherford sought declarations that: (1) any claims or damages sought by Amerril and KingKing were precluded by the Agreement; (2) pursuant to the Agreement, Amerril owed Weatherford defense and indemnity for claims asserted against it by Sun Delta and KingKing; (3) the Agreement "governs the parties' rights, duties and obligations"; (4) Weatherford was entitled to recover reasonable attorney's fees incurred in the collection of past due amounts owed by Amerril; and (5) Weatherford was entitled to interest at a rate of 12% per year for past due amounts owed by Amerril.
Additionally, Weatherford sought to foreclose on its mineral lien, and it asserted causes of action for fraud and fraud by non-disclosure against Amerril and KingKing. Finally, Weatherford brought a claim against Amerril and KingKing under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), alleging that the balance sheet purportedly submitted to Weatherford by Amerril identified over $50 million in stock that was fraudulently disposed of after Weatherford had filed suit. Weatherford sought attorney's fees pursuant to the Agreement, Civil Practice and Remedies Code chapters 37 and 38, Property Code section 53.156, and TUFTA.
D. The Trial Court Issues Several Partial Summary Judgment Rulings
Throughout the course of the lawsuit, Weatherford and the individual Weatherford entities filed several motions for partial summary judgment, seeking various interlocutory rulings from the trial court.
Weatherford sought a summary judgment ruling dismissing all of Amerril's claims against it on the basis that the Agreement included provisions stating that Amerril would hold Weatherford "harmless" for damage to the property, that Amerril would assume liability for damage to the wellbore, and that Amerril would defend and indemnify Weatherford. Weatherford Artificial Lift System sought a summary judgment ruling that Amerril *207 breached the Agreement by failing to pay $5,635,668.93 in unpaid invoices. Similarly, Precision Energy Services and Weatherford US sought summary judgment rulings that Amerril breached the Agreement by failing to pay $122,727.39 and $390,017.83, respectively, in unpaid invoices. The trial court granted each of these partial summary judgment motions.
Weatherford also moved for no-evidence summary judgment on Sun Delta's claims against it, and the trial court granted this motion, ruling that Sun Delta take nothing on its claims against Weatherford. Further, Weatherford moved for traditional and no-evidence summary judgment on KingKing's claims against it. Weatherford argued that all of KingKing's claims against it were based on property damage to the Well but that KingKing no longer owned an interest in the Well, and thus KingKing had no standing to complain about damages to that property. Weatherford also moved for no-evidence summary judgment, asserting that KingKing could produce no evidence on any of the elements of the claims brought against Weatherford. The trial court granted this motion, ruling that KingKing take nothing on its claims against Weatherford.
None of these rulings are challenged on appeal.
E. Weatherford Moves for Final Summary Judgment
On November 11, 2016, Weatherford moved for final summary judgment on its request for attorney's fees, its alter ego claim, its request for foreclosure of its mineral lien, its claims for declaratory relief, and its fraud claims. Weatherford requested that the trial court sever its TUFTA claim.
With respect to its request for attorney's fees, Weatherford argued that the Agreement provided that "Customer [Amerril] will reimburse Weatherford all collection costs (including reasonable attorneys' fees) if an attorney is hired to collect its past due account." Weatherford attached summary judgment evidence demonstrating that it had incurred $465,552.85 in trial-level attorney's fees, plus $121,844.17 in collection costs. In addition, Weatherford sought a total of $195,000 in conditional appellate-level attorney's fees.
Weatherford also argued that there was no material fact question that Amerril and KingKing were alter egos. As summary judgment evidence, Weatherford attached excerpts from the depositions of Jacque Bateman, Amerril's former accounting manager, and Robert Hadlow, KingKing's corporate representative and the interim chief financial officer of Amerril. Bateman testified that, as accounting manager, she was responsible for accounts payable and revenue and that she reported directly to Ping He, Amerril's chief executive officer. She testified that Amerril was a subsidiary of KingKing and that KingKing was a subsidiary of a Chinese corporation. According to Bateman, the Chinese corporation controlled Amerril's bank account by approving Amerril's expenses and releasing funds to Amerril's bank account. Weatherford attached the following excerpt from Bateman's deposition:
Q. What was Amerril's economic condition in the spring, summer, [and] fall of 2013?
A. I can't really say it was any different than the entire time that I was there, which is the-the funds in-all incoming funds would go to-in-deposited into a bank account that is controlled by U.S. KingKing. U.S. KingKing would approve funding requests, which would then bring it down to an Amerril bank account. At that time approved invoices would be set up to be released via wire transfer of those funds, *208 and that wire transfer would be released by a U.S. KingKing employee.
Q. So is it fair to say, from an accounting perspective, Amerril didn't really have its own funds; it was relying solely on funds it obtained from U.S. KingKing?
A. From the parent company, yes, sir.
Bateman further agreed that Amerril's funds were "filtered" through KingKing and that Amerril "had actually no local control." She testified that revenue from the Well was being deposited into a bank account controlled by KingKing.
Bateman also testified that Ping He authorized her to sign the Agreement with Weatherford on behalf of Amerril and that he had no objections to Amerril's entering into the Agreement. Bateman agreed that executing the Agreement was necessary for Amerril to obtain credit from Weatherford.
Robert Hadlow testified that he began working at Amerril in May 2014 and that he was hired to "clean up all the accounting" and evaluate all major transactions and assets "going back to 2012." Hadlow testified that both KingKing and Amerril had the same mailing address in Houston, although their offices were located in different suites. Hadlow identified a printout from a website with the address of www.us-kingking.com that stated, "Welcome to Amerril Energy" and "Amerril Energy LLC, the subsidiary of U.S. KingKing LLC, is an approved operator who manage[s] all the oil and gas assets in the United State[s]."[5] Hadlow testified that, in January 2014, Amerril transitioned "from being the operator for KingKing to actually receiving the properties that it was operating," and he stated that KingKing "contributed" the properties to Amerril and did not receive anything in return. Hadlow also testified that KingKing and Amerril had two officers in common: Ping He and Windsor Wen.
During Hadlow's deposition, Weatherford's counsel provided him with a copy of KingKing's balance sheet that was purportedly submitted to Weatherford during Amerril's credit application process and asked Hadlow if he had any reason to believe the balance sheet was inaccurate. Hadlow responded that he had to make several adjustments, and that several of the values included on the balance sheet, including stock, leasehold costs, and accounts receivable, were "way too high."[6] Hadlow also stated that the balance sheet reflected that KingKing's net income was around $92 million, but that amount was about $20 million too high, and that KingKing's actual net income was closer to $72 million. Weatherford's counsel also asked Hadlow, "For which tax years did you help gather documents for U.S. KingKing?" Hadlow responded that one of the projects he had been working on since he was hired was "to review the transactions and how they were booked before," and he further stated, "So I have been *209 involved in making any corrections that needed to be made from 2012 forward."
Weatherford attached a copy of this balance sheet, along with another document entitled "US Kingking Petroleum Operation Consolidated Statement of Operations For the Year Ended December 31, 2012," as summary judgment evidence. As a separate exhibit, Weatherford attached the Agreement, signed by Bateman. The Agreement consisted of two pages and was accompanied by an information sheet entitled, "Information for Credit Application," that listed KingKing as Amerril's "principal owner" and provided financial references, and a fax cover sheet addressed to "Weatherford Credit Dept." The attached fax transmission log indicated that a total of four pages were sent to Weatherford. Weatherford also attached a copy of its lien affidavit and the unpaid invoices sent to Amerril.
In its summary judgment motion, Weatherford argued that it had established alter ego based on Bateman's deposition testimony that KingKing controlled Amerril's bank account and Amerril did not have its own funds, Hadlow's testimony that KingKing and Amerril shared the same mailing address, Hadlow's testimony that KingKing and Amerril share two officers, Hadlow's testimony that he was employed by Amerril but helped prepare KingKing's tax returns, and Hadlow's testimony that KingKing "contributed" properties to Amerril for no consideration. Weatherford also argued that it established that Amerril and KingKing defrauded it, contending that Amerril provided Weatherford with KingKing's balance sheet when it applied for credit and that this document "grossly exaggerated" KingKing's assets.
Weatherford also argued that it conclusively established its right to foreclose on its mineral lien. It argued that it had provided materials, equipment, labor, and services to drill the Well, that the plaintiffs owned mineral interests in the Well, and that the lien was valid and timely-filed "to secure payment of outstanding amounts owed." Weatherford argued that it had conclusively established its right to declaratory relief, pointing to Bateman's deposition testimony that she signed the Agreement on behalf of Amerril and the terms of the Agreement itself, which demonstrated Weatherford's entitlement to declaratory relief.
Further, Weatherford argued that there was no material fact issue on its fraud claims, arguing that "Amerril and US KingKing represented that Amerril/US KingKing's financial condition was better than it was in order to obtain credit from Weatherford" and that Weatherford relied on that representation to its detriment. It argued that Amerril and KingKing "failed to disclose the true nature of their financial condition when applying for credit with Weatherford" and that the parties remained "deliberately silent when they had a duty to speak" to correct the misrepresentation.
KingKing did not file a response to Weatherford's final summary judgment motion.
F. The Trial Court Issues Final Summary Judgment
The trial court issued an order granting Weatherford's motion for final summary judgment on January 13, 2017. The trial court incorporated its prior partial summary judgment rulings into its final order, ruling that Amerril and Sun Delta take nothing on their claims against Weatherford, that Weatherford was entitled to defense and indemnity from Amerril with regard to the claims asserted against it by KingKing and Sun Delta for strict products liability and negligence, that Precision *210 Energy Services recover $122,727.39 plus 12% pre-judgment interest from Amerril, that Weatherford US recover $390,017.83 plus 12% pre-judgment interest from Amerril, and that Weatherford Artificial Lift System recover $5,635,668.93 plus 12% pre-judgment interest from Amerril.
The trial court also ruled that Weatherford recover from Amerril $465,552.85 in trial-level attorney's fees, a total of $195,000 in conditional appellate-level attorney's fees, and $121,844.17 in collection costs pursuant to the Agreement. The trial court rendered judgment that Amerril was the alter ego of KingKing "and therefore all sums awarded against Amerril in this judgment are hereby awarded against US KingKing as well, as a joint and several obligation with Amerril."
The trial court further ruled that Weatherford had a valid and enforceable mineral lien "against all real property interests of Amerril, US KingKing, and Sun Delta Inc. located in Leon County, Texas" and that Weatherford was entitled to foreclose on its mineral lien. The court entered the following declarations: (1) any claims and damages sought by Amerril and KingKing are precluded by the Agreement; (2) Amerril owes Weatherford defense and indemnity for claims asserted by Sun Delta and KingKing; (3) the Agreement governs the parties' rights, duties, and obligations; (4) Weatherford is entitled to reasonable attorney's fees incurred in the collection of past-due amounts from Amerril; and (5) Weatherford is entitled to interest at a rate of 12% per annum for any past due amounts owed by Amerril.
The trial court severed Weatherford's TUFTA claims against Amerril and KingKing.
The order included the following statement: "This court intends for this judgment to constitute the court's final and appealable judgment resolving all claims as to all parties herein. Any claims not severed and not adjudicated or dismissed by prior court rulings or this final judgment are hereby dismissed."
G. KingKing Moves for a New Trial
Shortly after the trial court signed its final judgment, KingKing moved for a new trial, raising four issues. Specifically, KingKing argued that Weatherford failed to meet its summary judgment burden to establish that Amerril was KingKing's alter ego, that Weatherford failed to establish that it was entitled to declaratory relief against KingKing because it presented no evidence binding KingKing to the Agreement, that declaratory relief was improper because the matters on which Weatherford sought declarations were already before the court in other causes of action, and that Weatherford improperly obtained summary judgment on its foreclosure claim against KingKing despite offering no proof that KingKing owned an interest in the property foreclosed upon.
KingKing argued that Weatherford failed to establish as a matter of law both that Amerril was the alter ego of KingKing and that KingKing used Amerril to perpetrate an actual fraud on Weatherford. KingKing, noting that the trial court dismissed Weatherford's fraud claims, argued that Weatherford presented no evidence of "any dishonesty of purpose or intent to deceive as it relates to [KingKing's] ownership interest in Amerril or its dealings with Weatherford" and that Weatherford presented no evidence that any representative of KingKing ever had any communications with Weatherford.
As evidence supporting its motion for new trial, KingKing attached additional excerpts from Hadlow's deposition. Hadlow testified that Amerril and KingKing have separate bank accounts and that, while *211 Amerril can access KingKing's banking information upon request, "it's not something they would access on a daily basis." Hadlow stated that Amerril and KingKing have their own separate internal accounting systems and payroll systems. Hadlow described the procedure for paying invoices at Amerril as follows:
There was revenue that came in from the properties that went into a bank account called the income bank account. Then the invoices were-associated with those properties were batched up, okay. There was a check inside the system that said, had there been duplicate payments made, that needed to be attached. And then there was a review of this month to last month. And then the money was released out of the property income account into a[n] operating account and into a petty cash account. Okay. There was not a funding from KingKing. This was revenue going into the income account, and then it was transferred to accounts that you could write checks in.
Hadlow specifically testified that he disagreed "almost totally" with how Bateman had described the process by which invoices and accounts were paid. Hadlow also stated that because Amerril was the operating company for properties owned by KingKing, Amerril employees would perform tasks for KingKing properties, but they would not perform tasks for KingKing if it "needed something done in its corporate capacity." With respect to the balance sheet purportedly provided to Weatherford, Hadlow stated that it did not "seem to be the right statement to include for Amerril" and if it was provided to Weatherford, that appeared to be "an oversight."
The trial court denied KingKing's motion for new trial. This appeal followed.[7]
Veil Piercing
In its first issue, KingKing contends that the trial court erred in granting summary judgment against it because Weatherford failed to conclusively establish that Amerril was KingKing's alter ego and that KingKing used Amerril to perpetrate an actual fraud on Weatherford for KingKing's direct personal benefit.
A. Summary Judgment Standard of Review
We review a trial court's ruling on a summary judgment motion de novo. Travelers Ins. Co. v. Joachim , 315 S.W.3d 860, 862 (Tex. 2010). To prevail on a traditional summary judgment motion, the movant bears the burden of proving that no genuine issues of material fact exist and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c) ; Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding , 289 S.W.3d 844, 848 (Tex. 2009). When a plaintiff moves for summary judgment on its own claim, it must conclusively prove all essential elements of its claim. Cleveland v. Taylor , 397 S.W.3d 683, 696-97 (Tex. App.-Houston [1st Dist.] 2012, pet. denied).
A matter is conclusively established if reasonable people could not differ as to the conclusion to be drawn from the evidence. See City of Keller v. Wilson , 168 S.W.3d 802, 816 (Tex. 2005) ; Cleveland , 397 S.W.3d at 697. If the movant meets its burden, the burden then shifts to the nonmovant to raise a genuine issue of material fact precluding summary judgment. See Centeq Realty, Inc. v. Siegler , 899 S.W.2d 195, 197 (Tex. 1995) ; see also Goodyear Tire & Rubber Co. v. Mayes , 236 S.W.3d 754, 755 (Tex. 2007) (per curiam) (stating *212 that appellate courts reviewing summary judgments must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all evidence presented). We review the evidence presented in the motion and response in the light most favorable to the nonmovant, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. Fielding , 289 S.W.3d at 848 (citing City of Keller , 168 S.W.3d at 827 ); Cleveland , 397 S.W.3d at 697. We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. Sw. Elec. Power Co. v. Grant , 73 S.W.3d 211, 215 (Tex. 2002) ; Cleveland , 397 S.W.3d at 697.
If the movant does not satisfy his initial burden, then the burden does not shift and the nonmovant need not respond or present any evidence. Amedisys, Inc. v. Kingwood Home Health Care, LLC , 437 S.W.3d 507, 511 (Tex. 2014). "This is because 'summary judgments must stand or fall on their own merits, and the nonmovant's failure to answer or respond cannot supply by default the summary judgment proof necessary to establish the movant's right' to judgment." Id. at 511-12 (quoting McConnell v. Southside Indep. Sch. Dist. , 858 S.W.2d 337, 343 (Tex. 1993) ). Thus, a nonmovant who fails to respond to a summary judgment motion, as here, may still challenge on appeal "the legal sufficiency of the grounds presented by the movant." Id. at 512 (quoting McConnell , 858 S.W.2d at 343 ). That is, the nonmovant may still argue on appeal that the movant did not conclusively establish its causes of action. See ids="10002094" index="16" url="https://cite.case.law/sw2d/858/337/#p343">id. ("The nonmovant has no burden to respond to a summary judgment motion unless the movant conclusively establishes its cause of action or defense. The trial court may not grant summary judgment by default because the nonmovant did not respond to the summary judgment motion when the movant's summary judgment proof is legally insufficient.") (quoting Rhone-Poulenc, Inc. v. Steel , 997 S.W.2d 217, 222-23 (Tex. 1999) ).
B. Governing Law
"A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations." Willis v. Donnelly , 199 S.W.3d 262, 271 (Tex. 2006). The Texas Legislature has specifically set out when the corporate fiction may be disregarded and individual shareholders, or members in the case of a limited liability company, may be held liable for the corporation's contractual obligations.
Business Organizations Code section 21.223 provides:
(a) A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to:
....
(2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory;
....
(b) Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for *213 the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.
TEX. BUS. ORGS. CODE ANN. § 21.223 (West 2012). The principles applicable to piercing the corporate veil apply equally to limited liability companies. McCarthy v. Wani Venture, A.S. , 251 S.W.3d 573, 590-91 (Tex. App.-Houston [1st Dist.] 2007, pet. denied) ; see TEX. BUS. ORGS. CODE ANN. § 101.002(a) (West 2012) (providing that section 21.223 applies to limited liability companies and their members). Although "actual fraud" is not statutorily defined, courts have construed that term, for purposes of piercing the corporate veil, as "involv[ing] dishonesty of purpose or intent to deceive." Tryco Enters., Inc. v. Robinson , 390 S.W.3d 497, 508 (Tex. App.-Houston [1st Dist.] 2012, pet. dism'd) ; see TecLogistics, Inc. v. Dresser-Rand Grp., Inc. , 527 S.W.3d 589, 598 (Tex. App.-Houston [14th Dist.] 2017, no pet.).
Generally, a corporation is a separate legal entity that insulates its owners or shareholders from personal liability for corporate obligations. Nichols v. Tseng Hsiang Lin , 282 S.W.3d 743, 747 (Tex. App.-Dallas 2009, no pet.). Alter ego applies "when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." Tryco Enters. , 390 S.W.3d at 508 (quoting Castleberry v. Branscum , 721 S.W.2d 270, 272 (Tex. 1986) ); see Wilson v. Davis , 305 S.W.3d 57, 69-70 (Tex. App.-Houston [1st Dist.] 2009, no pet.) (stating that rationale behind alter-ego doctrine is that "if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors") (quoting Castleberry , 721 S.W.2d at 272 ). Alter ego is determined from the "total dealings" of the corporation and the individual owner, including the degree to which corporate and individual property have been kept separate, the amount of financial interest, ownership, and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes. Tryco Enters. , 390 S.W.3d at 508 ; see also Endsley Elec., Inc. v. Altech, Inc. , 378 S.W.3d 15, 23 & n.7 (Tex. App.-Texarkana 2012, no pet.) (stating that courts consider "inadequate capitalization" in disregarding corporate fiction, but this factor is not sufficient, standing alone, to pierce corporate veil).
Parties are not, however, jointly liable for a corporation's obligations merely because they were part of a "single business enterprise," that is, "merely because of centralized control, mutual purposes, and shared finances." Tryco Enters. , 390 S.W.3d at 508 (quoting SSP Partners v. Gladstrong Invs. (USA) Corp. , 275 S.W.3d 444, 455 (Tex. 2008) ). Instead, there must also be evidence of the kinds of abuse that the corporate structure "should not shield," such as "fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like." SSP Partners , 275 S.W.3d at 455.
Disregarding the corporate structure involves two considerations: (1) the relationship between the entities, and (2) whether the entities' use of limited liability was illegitimate. Id. ; Tryco Enters. , 390 S.W.3d at 508. Thus, to pierce the corporate veil and impose liability under an alter-ego theory, the plaintiff must demonstrate (1) that the entity on which it seeks to impose liability is the alter ego of the debtor, and (2) that the corporate fiction was used for an illegitimate purpose, that is, to perpetrate an actual fraud on *214 the plaintiff for the defendant's direct personal benefit. Tryco Enters. , 390 S.W.3d at 508 ; see TEX. BUS. ORGS. CODE ANN. § 21.223(b) ; Metroplex Mailing Servs., LLC v. RR Donnelley & Sons Co. , 410 S.W.3d 889, 896-97 (Tex. App.-Dallas 2013, no pet.) ("Evidence that a company was used as an alter ego does not, by itself create an issue regarding whether it was used to commit an actual fraud on the plaintiff for the defendant's personal benefit."). "Generally, alter ego will not apply to disregard the corporate form absent exceptional circumstances." Nugent v. Estate of Ellickson , 543 S.W.3d 243, 265 (Tex. App.-Houston [14th Dist.] 2018, no pet. h.).
C. Analysis
1. Whether Weatherford conclusively established that Amerril was the alter ego of KingKing
In determining whether the first consideration in piercing the corporate veil has been satisfied-whether the company and the owner of the company are alter egos-we assess the relationship between the entities using such factors as: (1) whether the entities shared a common business name, common offices, common employees, or centralized accounting; (2) whether one entity paid the wages of the other entity's employees; (3) whether one entity's employees rendered services on behalf of the other entity; (4) whether one entity made undocumented transfers of funds to the other entity; and (5) whether the allocation of profits and losses between the entities is unclear. Tryco Enters. , 390 S.W.3d at 509 (citing SSP Partners , 275 S.W.3d at 450-51 ). Courts may also consider, as proof of alter ego: (1) the payment of alleged corporate debts with personal checks or other commingling of funds; (2) representations that the individual will financially back the corporation; (3) the diversion of company profits to the individual for his personal use; (4) inadequate capitalization; and (5) other failures to keep corporate and personal assets separate. Penhollow Custom Homes, LLC v. Kim , 320 S.W.3d 366, 372 (Tex. App.-El Paso 2010, no pet.).
Weatherford argues that it conclusively established, as a matter of law, that Amerril was the alter ego of KingKing, that is, that "there is such unity between [Amerril] and [KingKing] that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." See Tryco Enters. , 390 S.W.3d at 508. Weatherford contends that its summary judgment evidence established that KingKing's employees rendered services for Amerril. It points to Hadlow's testimony that, although he had been designated as KingKing's corporate representative for the purposes of the deposition, he was Amerril's interim chief financial officer and he had helped prepare KingKing's tax returns. Weatherford also points out that KingKing's officers were Ping He and Windsor Wen, whom Hadlow testified were also employed by Amerril. Weatherford thus argues that its evidence demonstrated that "employees of Amerril routinely handle the duties of US KingKing and vice versa."
Weatherford also relies on Bateman's testimony that KingKing controlled Amerril's bank account, such that Amerril made funding requests to KingKing in order to pay invoices, and, once KingKing approved the requests, the funds would be released by a KingKing employee to Amerril's bank account. Bateman testified, "Amerril had actually no local control." Weatherford argues that this testimony further proved that KingKing's employees rendered services on behalf of Amerril and that the two entities had a centralized accounting system, *215 with an unclear allocation of profits and losses.
Weatherford also points to KingKing's website, www.us-kingking.com, which states, "Welcome to Amerril Energy," and includes a logo that reads "Kingking," with "Amerril Energy LLC" directly below it. Weatherford also presented evidence in the form of the "Information for Credit Application" sheet attached to Amerril's application for credit with Weatherford that reflected that Amerril and KingKing had the same mailing address. Weatherford further argued that the evidence established that "Amerril and US KingKing routinely swapped assets for no consideration," citing Hadlow's testimony that KingKing "contributed" its oil-and-gas properties, including the Well, to Amerril in 2014 for no consideration. Weatherford thus argues that "the uncontroverted evidence establishes that Amerril is the alter ego of US KingKing."
Uncontroverted evidence, however, is not necessarily conclusive evidence. See City of Keller , 168 S.W.3d at 816 (stating that "[e]vidence is conclusive only if reasonable people could not differ in their conclusions" and that "[u]ndisputed evidence and conclusive evidence are not the same-undisputed evidence may or may not be conclusive, and conclusive evidence may or may not be undisputed"). Weatherford presented evidence that KingKing and Amerril share officers-Ping He and Windsor Wen-and that KingKing controls Amerril's finances. But as the Texas Supreme Court stated in SSP Partners , the "[c]reation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace," and courts have "never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances." See 275 S.W.3d at 455.
Amerril and KingKing do not share a common business name. Although Weatherford presented evidence that Amerril and KingKing share the same mailing address, Hadlow testified that the companies have offices in different suites but receive their mail at the same suite for convenience. No evidence in the record reflected whether Amerril or KingKing paid the wages of employees of the other entity. Although Weatherford argued that Hadlow testified as KingKing's corporate representative despite being Amerril's interim chief financial officer and that Hadlow helped prepare KingKing's tax returns, Hadlow's testimony was that he had been hired by Amerril to "review the transactions and how they were booked before," and that he has "been involved in making any corrections that needed to be made from 2012 forward." Weatherford presented no evidence that any other employee of Amerril, aside from Hadlow, performs tasks or renders services for KingKing, and thus the record does not demonstrate that "employees of Amerril routinely handle the duties of US KingKing," as Weatherford contends.
The record also contains no evidence of "undocumented transfers of funds" between the entities. See Tryco Enters. , 390 S.W.3d at 509. Hadlow testified that KingKing "contributed" oil and gas properties, including the Well, to Amerril and that Amerril did not pay consideration to KingKing, but Hadlow also testified Amerril transitioned from merely being the operator for KingKing's properties to owning and operating them. Moreover, Weatherford presented no evidence that these transfers were "undocumented"[8] or that *216 the entities "routinely swapped assets" or made undocumented loans to each other. See, e.g. , Latham v. Burgher , 320 S.W.3d 602, 609 (Tex. App.-Dallas 2010, no pet.) (considering, as evidence supporting jury's finding that shareholder and corporation were alter egos, fact that shareholder accepted personal loan from corporation and financial documents did not reflect that loan was ever paid back). Weatherford also did not present evidence that KingKing used funds that Amerril collected, such as revenue from the Well, for KingKing's own purposes unrelated to Amerril. See Penhollow Custom Homes , 320 S.W.3d at 372 (considering whether individual diverted company profits for own personal use).
Weatherford cites the Beaumont Court of Appeals' decision in Hall v. Timmons , 987 S.W.2d 248 (Tex. App.-Beaumont 1999, no pet.), for the proposition that all of the corporation's funds for operations and purchases came from the chairman, who personally approved or denied the requests for funds, as evidence that "established alter ego." Hall , however, was in a different procedural posture from this case. In Hall , a jury found that the corporation and the individual shareholder were alter egos. Id. at 250. The corporation and the shareholder moved for judgment notwithstanding the verdict, arguing that the trial court erred in submitting the alter-ego question to the jury because there was no evidence of alter ego. Id. The trial court denied the motion for JNOV, and the corporation and the shareholder challenged that denial on appeal. Id. The Beaumont Court of Appeals considered evidence that the shareholder's personal operating account was the source of all of the corporation's funds, that the shareholder personally approved or denied funds for the corporation, and that the corporation had to request funds from the shareholder, among other evidence, and concluded that there was "some evidence to disregard the corporate fiction on the basis of alter ego" such that the trial court did not err by denying the motion for JNOV. Id. at 250-51. The Beaumont Court did not hold that the evidence presented conclusively established alter ego, nor was it required to so hold under the appropriate standard of review. See, e.g. , Trinity Indus., Inc. v. Ashland, Inc. , 53 S.W.3d 852, 863 (Tex. App.-Austin 2001, pet. denied) (stating that appellate courts review denial of motion for JNOV under no-evidence standard of review and if record includes "more than a scintilla of evidence" to support jury's findings, trial court properly denied JNOV).
"Evidence is conclusive only if reasonable people could not differ in their conclusions, a matter that depends on the facts of each case." City of Keller , 168 S.W.3d at 816. Weatherford presented some evidence that supports an alter ego finding. However, considering the record and the applicable law, Weatherford has not established, as a matter of law, that "there is such unity between [Amerril] and [KingKing] that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice." See Tryco Enters. , 390 S.W.3d at 508. We hold that Weatherford has not conclusively established that Amerril was the alter ego of KingKing, as it was required to do to meet its summary judgment burden. See TEX. R. CIV. P. 166a(c) ; see also Wilson , 305 S.W.3d at 69 (stating that because the determination of disregarding *217 the corporate fiction focuses in large part on equity, " '[t]he different bases for disregarding the corporate fiction involve questions of fact,' which, absent 'very special circumstances,' 'should be determined by the jury' ") (quoting Castleberry , 721 S.W.2d at 277 ).
2. Whether Weatherford conclusively established that KingKing used Amerril to perpetrate an actual fraud on Weatherford for KingKing's direct personal benefit
Even if Weatherford had conclusively established that Amerril was the alter ego of KingKing, to overcome the statutory limitations on a member's liability for a company's obligations and pierce the corporate veil, Weatherford also needed to conclusively establish that KingKing caused Amerril to be used for the purpose of perpetrating and did perpetrate an actual fraud on Weatherford primarily for KingKing's direct personal benefit. See TEX. BUS. ORGS. CODE ANN. § 21.223(b). "Actual fraud," as used in section 21.223, "involves dishonesty of purpose or intent to deceive." Tryco Enters. , 390 S.W.3d at 508. This particular determination involves a consideration of whether the entities' use of limited liability was illegitimate. SSP Partners , 275 S.W.3d at 455.
Weatherford argues that there is "no question of material fact" that Amerril and KingKing defrauded it. It points out that, during the credit application process, Amerril gave Weatherford a balance sheet for KingKing that "grossly exaggerated" KingKing's assets and net income. However, as KingKing points out, aside from Weatherford's conclusory arguments that Amerril "gave" KingKing's balance sheet to Weatherford, Weatherford presented no evidence concerning how it obtained the balance sheet. Weatherford attached KingKing's balance sheet as summary judgment evidence, and it also attached Amerril's credit application, but as a separate exhibit. The fax transmission log attached to Amerril's credit application reflected that Amerril faxed four pages to Weatherford: the fax cover sheet addressed to "Weatherford Credit Dept[.]," the two-page Agreement signed by Bateman as Amerril's accounting manager, and a one-page document entitled "Information for Credit Application" that listed KingKing as Amerril's "principal owner" and provided banking information and credit references. KingKing's balance sheet was not attached to this summary judgment exhibit.
Weatherford did not present any evidence, whether by affidavit or deposition testimony, from any of its employees, such as individuals in the credit department who would have been involved in making the decision to extend credit to Amerril. Weatherford presented no evidence from its employees concerning the circumstances under which the company received Amerril's credit application, whether KingKing's balance sheet was attached to this application or received at some other time, or whether the credit department relied on KingKing's balance sheet in deciding to extend credit to Amerril. Weatherford presented deposition testimony from Bateman that she knew the credit application was necessary to receive credit, but Weatherford presented no testimony from Bateman concerning the specific financial information from Amerril that she provided to Weatherford. Bateman did not testify that she attached KingKing's balance sheet to Amerril's credit application, nor did she testify that anyone at KingKing directed her to use KingKing's financial information to obtain credit on behalf of Amerril.
Furthermore, although Weatherford presented Hadlow's testimony that several values on KingKing's balance sheet were *218 too high, this alone does not establish, as a matter of law, that Amerril and KingKing acted fraudulently in submitting the balance sheet to Weatherford, if in fact they did so, to obtain credit for Amerril. Weatherford cites the Bankruptcy Court of the Western District of Texas's opinion in In re Morrison , 361 B.R. 107 (Bankr. W.D. Tex. 2007), for the proposition that the submission of false financial statements to obtain a benefit satisfies section 21.223(b)'s actual fraud requirement. On appeal in Morrison , the Fifth Circuit noted that the bookkeeper for Morrison Excavation "found an accounting error that overstated the company's accounts receivable by approximately $857,000, which meant that Morrison Excavation was no longer solvent." In re Morrison , 555 F.3d 473, 477 (5th Cir. 2009). One week later, a company to which Morrison Excavation had submitted a bid for a subcontract job requested a copy of Morrison Excavation's financial statement, and Morrison, the president and principal shareholder of Morrison Excavation, "faxed a copy of a financial statement that still reflected the inflated accounts receivable error." Id. The Fifth Circuit upheld the Bankruptcy Court's findings that Morrison personally committed fraud when he sent the false financial statement, that Morrison knew of the error in the statement, and that Morrison intended to deceive the other company. Id. at 482.
Here, Hadlow testified that he began working at Amerril in 2014 and that he was hired to "clean up" Amerril's accounting and review and evaluate major transactions going back to 2012. In his review, he discovered that KingKing's balance sheet, which was purportedly provided to Weatherford, had several errors that included overvaluing KingKing's accounts receivable, overvaluing stock KingKing owned in two other companies, overvaluing leasehold costs, and overvaluing KingKing's net income by approximately $20 million.
Weatherford presented no evidence that individuals at Amerril or KingKing knew that this balance sheet was inaccurate at the time it was purportedly submitted to Weatherford or at any time before Hadlow discovered the error. Weatherford presented no evidence that Amerril knowingly submitted a false and inaccurate balance statement of its member and parent company in order to receive credit from Weatherford for itself. And Weatherford presented no evidence that Amerril and KingKing worked in concert to deliberately deceive Weatherford into extending credit to a company that was not creditworthy and could not pay its bills. At most, Weatherford's evidence establishes that, at some point, it received a balance sheet of KingKing that contained several overstated values. No evidence, however, establishes when Weatherford received this document, whether it relied upon this document in extending credit to Amerril, or whether Amerril knowingly submitted inaccurate financial information to obtain credit. Weatherford also presented no evidence that Amerril was insolvent or could not pay a judgment against it. Instead, the evidence reflected that KingKing had transferred oil and gas assets, including the Well, to Amerril, rather than transferring assets away from Amerril. See Tryco Enters. , 390 S.W.3d at 510 (considering, as evidence that corporate structure had been used for illegitimate purpose, fact that owners had transferred assets away from corporation after judgment had been entered against corporation, leaving it unable to pay judgment against it); Latham , 320 S.W.3d at 610 (holding that sufficient evidence supported finding of actual fraud when, after corporation had been threatened with lawsuit, shareholder dissolved corporation and took corporation's assets and property for himself).
*219 Based on this record, we conclude that Weatherford has not established, as a matter of law, that Amerril and KingKing acted with "dishonesty of purpose or intent to deceive." See Tryco Enters. , 390 S.W.3d at 508. Weatherford also has not conclusively established that Amerril's and KingKing's use of limited liability was "illegitimate" or that the companies used the corporate structure to shield abuse such as "fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like." See SSP Partners , 275 S.W.3d at 455. Because we conclude that Weatherford has not established that KingKing caused Amerril "to be used for the purpose of perpetrating and did perpetrate an actual fraud" on Weatherford primarily for KingKing's direct personal benefit, we hold that the trial court erred in ruling that KingKing was jointly and severally liable for Amerril's contractual obligations to Weatherford. See TEX. BUS. ORGS. CODE ANN. § 21.223(b) ; Metroplex Mailing Servs. , 410 S.W.3d at 896 ("The statutory protections afforded to members and managers of an LLC give way only when a plaintiff can show that the LLC was used for the purpose of perpetrating, and did perpetrate, an actual fraud for the member or manager's direct personal benefit.").
We sustain KingKing's first issue.
Effect on Weatherford's Claims Against KingKing
In its second issue, KingKing argues that the trial court properly dismissed Weatherford's trial claims for common-law fraud and fraud by nondisclosure and thus these claims cannot support the trial court's judgment. KingKing also argues, in its third, fourth, and fifth issues, that the trial court erred to the extent that it granted summary judgment against it on Weatherford's claims for attorney's fees, declaratory relief, and foreclosure of its mineral lien.
In its live pleading, Weatherford asserted the following claims: breach of contract against Amerril; breach of contract against KingKing via Business Organizations Code section 21.223(b) ; declaratory relief against Amerril, KingKing, and Sun Delta concerning various provisions of the Agreement signed by Amerril; foreclosure of its mineral lien; common-law fraud against Amerril and KingKing; fraud by nondisclosure against Amerril and KingKing; violations of TUFTA against Amerril and KingKing; and attorney's fees based on several statutory provisions and the Agreement.
In its "Final Summary Judgment and Severance Order," the trial court incorporated its prior partial summary rulings and ruled that Amerril breached its contract with each of the Weatherford entities and, in addition to damages, was also liable for attorney's fees and collection costs pursuant to the Agreement. The trial court ruled that Amerril and KingKing were alter egos, such that KingKing was jointly and severally liable for Amerril's contractual obligations. The trial court ruled that Weatherford had a valid and enforceable mineral lien against the real property interests of Amerril, KingKing and Sun Delta in Leon County and that Weatherford was entitled to foreclose upon that lien. The trial court entered declaratory relief as requested by Weatherford, and it also severed Weatherford's TUFTA claim. The trial court made no specific references to Weatherford's claims for common-law fraud and fraud by nondisclosure. Instead, the trial court concluded its final judgment by stating, "This court intends for this judgment to constitute the court's final and appealable judgment resolving all claims as to all parties herein. Any claims not severed and not adjudicated or dismissed *220 by prior court rulings or this final judgment are hereby dismissed."
Weatherford's common-law fraud and fraud by nondisclosure claims were not disposed of by prior rulings, nor were they specifically addressed in the final judgment. We therefore agree with KingKing that the trial court dismissed those claims.[9] We also agree with KingKing that the trial court's rulings against it on each of Weatherford's other claims are predicated on KingKing's being liable for Amerril's obligations pursuant to section 21.223(b). Thus, because we hold that Weatherford has not conclusively established KingKing's liability for Amerril's obligations under section 21.223(b), we hold that any ruling finding KingKing liable for Amerril's obligations is premature. We therefore reverse the trial court's judgment to the extent that it holds KingKing liable for Amerril's contractual obligations and Weatherford's attorney's fees and collection costs, enters declaratory judgment against KingKing, and forecloses upon any real property interests of KingKing in Leon County.[10]
Conclusion
We reverse the trial court's finding that Amerril and KingKing are alter egos. We therefore reverse the portions of the trial court's judgment that hold KingKing liable for Amerril's obligations. We remand for further proceedings.

Sun Delta was a party in the underlying proceedings, but it is not a party to this appeal.

The parties entered into a Rule 11 Agreement to dismiss, without prejudice, the cause of action filed in Leon County.

These third parties included Sabine Pipe, Inc., MCM Houston Tejas Tubular Holding Company, Triad Pipe & Steel, LLC, United States Steel Corp., Express Energy Services, LLC, and Superior Energy Services, Inc. The plaintiffs did not recover against any of these third parties, and none of these parties are parties to this appeal.

In addition to the unpaid invoices described in Weatherford's lien affidavit, Weatherford also alleged that Amerril failed to pay Weatherford Laboratories Inc. $2,640 for goods and services provided to the T Keeling 1H well, also located in Leon County.

Weatherford also attached a copy of this printout as summary judgment evidence. The top of the website featured a logo that said "Kingking," with "Amerril Energy LLC" underneath.

Hadlow testified that "at least 3 or 4 million" of the near-thirty million value for "leasehold costs," listed as a "fixed asset" of KingKing's, should have been written off. He also stated that KingKing's stock in Sun Resources-valued at $14,597,979-and Halcon-valued at $38,785,974-should have been valued 20% lower. Hadlow also testified that the balance sheet listed KingKing's accounts receivable at $2,349,148 and its prepaid oil and gas expenses at $1,941,945, but these two amounts should have been "netted against each other," such that the "true value" was around $400,000, instead of around $4.2 million.

KingKing is the only party that appealed the trial court's final summary judgment order. Neither Amerril nor Sun Delta is a party to this appeal.

Prior to its filing the final summary judgment motion, Weatherford moved for traditional and no-evidence summary judgment on KingKing's claims against it. As evidence that KingKing did not own the Well, and thus had no standing to assert claims for damage to the Well, Weatherford attached an "Assignment, Contribution, Assumption and Bill of Sale" transferring KingKing's interest in the Well to Amerril. This was, therefore, not an undocumented transfer.

Weatherford presents no argument to the contrary on appeal, nor did it file a cross-appeal contending that the trial court erroneously dismissed its fraud claims.

Because we hold that the trial court erroneously rendered summary judgment against KingKing and remand the case for further proceedings, we need not address KingKing's sixth appellate issue-whether the trial court abused its discretion by denying KingKing's motion for new trial.