COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS


| | | |
|---|---|---|
| R&M MIXED BEVERAGE CONSULTANTS, INC., | § | No. 08-17-00054-CV |
| Appellant, | § | Appeal from the |
| v. | § | 210th District Court |
| SAFE HARBOR BENEFITS, INC., USG INSURANCE SERVICES, INC., RYAN SPECIALTY GROUP SERVICES, LLC, AND/OR RYAN SPECIALTY GROUP, LLC, | § § § | of El Paso County, Texas (TC# 2016DCV0374) |
| Appellees. | § | |

## **O P I N I O N**

Appellant, R&M Mixed Beverage Consultants, Inc. (R&M), is a Texas Corporation that owns and operates several bar and grill establishments including Mavericks Bar & Grill (Mavericks), located in El Paso, Texas. R&M filed third-party petitions against Safe Harbor Benefits, Inc. (Safe Harbor), USG Insurance Services, Inc., (USG), Ryan Specialty Group Services, LLC and/or Ryan Specialty Group, LLC (collectively, Ryan Specialty Group), which it named as successors to entities including WKF&C Agency Inc., WKF&C Agency, Inc. of Texas, and WKF&C Agency (collectively, WKFC), asserting a claim of negligence coupled with violations of the Texas Insurance Act and the Texas Deceptive Trade Practices Act (DTPA). Collectively, the Appellees here only include Safe Harbor, USG, Ryan Specialty Group, LLC, and

Ryan Specialty Group Services, LLC (Appellees or third-party defendants), as the WKFC entities were never served with process and are not parties in this suit.[1] On appeal, R&M challenges the trial court's order granting summary judgment in its entirety in favor of Appellees. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### *The Purchase of the Policy*

Richard Chavez and his brother Raymond ("Mike") Chavez owned and operated R&M with Richard serving as President and Mike serving as vice-president. Along with other duties, Richard assumed responsibility for procuring liquor liability protection for the bar and grills that R&M operated. In 2006, he approached Victoria Weir, an agent for Appellee Safe Harbor, to assist him in obtaining insurance coverage. Although Safe Harbor could not write a policy directly, Weir contacted a wholesale broker, Appellee USG, to assist with procuring a policy for R&M. In December 2006, R&M purchased its first liquor liability policy from First Mercury, a surplus lines company, which it then renewed a year later.

Before the policy expired in December of 2008, R&M asked for a new quote, and at that time, Safe Harbor again contacted USG, which then contacted WKF&C Agency, a managing general underwriter, which then contacted Indemnity Insurance of DC Group (Indemnity) from whom it received a quote for coverage along with financial information and disclosures about the company. The information indicated that Indemnity had received an "A-" rating from A.M. Best, a well-known rating company, which placed Indemnity in the "excellent" category, among other

---

[1] On August 18, 2017, we issued an order in which we concluded that WKF&C Agency, Inc. and WKF&C Agency, Inc. of Texas were not parties to this appeal as we were informed by counsel that these entities were never served with process.

2

companies rated. The information also described Indemnity as being licensed to operate in various states, including Texas, by respective departments of insurance.

In addition, Safe Harbor provided R&M with written notice that Indemnity was registered with the State as a Risk Retention Group (RRG), which under Texas law, meant it did not participate in the Texas insolvency guaranty fund. Safe Harbor further informed R&M that an RRG is a "non-traditional market," and R&M needed to be "aware of certain information about this market." Through a series of transactions involving the Appellees, and formerly owned entities such as WKF&C, R&M purchased a liquor liability policy issued by Indemnity.

On December 18, 2008, Richard Chavez signed an "acknowledgment" stating that he understood that the "coverage written [was] not subject to the protection and benefits of the state guaranty associations," and that R&M had agreed to hold Safe Harbor and WKF&C harmless with respect to "any future loss, damage, expense, or other financial risk and/or any other dispute that may arise relative" to its placement of coverage with Indemnity. As well, the policy itself contained a notice stating that: "Insurance Insolvency guaranty funds are not available for your risk retention group."

Thereafter, R&M renewed its policy with Indemnity in 2009 and 2010, through the same series of transactions as before, thereby obtaining coverage through December 2010. With each renewal, R&M received the same information as before about Indemnity's rating with A.M. Best and the nature of its operations. At renewal, Indemnity had received an "A-" rating from A.M. Best. Once issued, the policy itself contained a notice that Indemnity continued operating as an RRG in the issuing state.

*The Dram Shop Lawsuits and Indemnity's Liquidation*

3

In September 2011, two different customers who were served liquor at Mavericks were involved in separate accidents. In July of 2012, victims of the first accident filed a lawsuit against the driver who had been served liquor at Maverick's, and against R&M under the Dram Shop Act. A year later, a similar suit was filed by the victims of the second accident. Initially, Indemnity proceeded to defend R&M in both suits by contracting and paying attorneys to enter appearances and defend against all allegations asserted. By April of 2014, however, circumstances changed after Indemnity suffered a precipitously-occurring financial calamity that resulted it its eventual liquidation, not only causing attorneys representing R&M to withdraw and leave R&M to defend itself, but also exposing it to liability without insurance coverage. The record indicates that A.M. Best had downgraded Indemnity's rating on September 24, 2013, when it issued a revision indicating that Indemnity had suffered a "precipitous decline" in its capitalization structure. At that time, the rating agency placed Indemnity "under review," and downgraded its rating to a "B." The revision stated that it still had faith in Indemnity's ability to address its capitalization issue given its history and expertise in the insurance industry, but further warned that another "negative rating action may occur if capital levels do not continue to support the ratings and if compliance does not improve."

In addition, on July 26, 2013, the Insurance Commissioner of the State of Delaware, where Indemnity was incorporated, filed a Liquidation Petition, seeking entry of a Liquidation and Injunction Order, in light of Indemnity's financial issues. Following an investigation, the Commissioner determined that Indemnity's financial situation had not improved, and that its financial condition was so "unsound" and "impaired" that any further transaction of insurance as a going concern posed a hazard to its policy holders. Therefore, on November 7, 2013, a court of

4

chancery in the State of Delaware issued a Rehabilitation and Injunction Order, enjoining Indemnity from conducting any additional business and appointed the Insurance Commissioner as a receiver to conduct business on behalf of Indemnity and to take control of its assets. On April 10, 2014, the court entered a "Liquidation and Injunction Order," indicating that the Commissioner had uncovered several areas of "high concern" regarding Indemnity's financial viability, and information indicating that Indemnity's principal, Jeffrey B. Cohen, had engaged in possible fraudulent conduct.[2] The court concluded that Indemnity was unable to develop a Rehabilitation Plan to remediate and correct its financial issues, and that liquidation was in order, thereby requiring that all insurance policies issued by Indemnity be cancelled, and that anyone holding a policy had the right to file a claim with the receiver on or before January 16, 2015 for any losses incurred.[3]

**The Third-Party Lawsuits and the Motions for Summary Judgment**

After Indemnity became insolvent and its lawyers withdrew from the litigation, R&M filed its initial third-party petition, in March of 2015, against Safe Harbor and USG. Months later, in July 2015, R&M supplemented to add WKF&C, and its related entities, Ryan Specialty Group, LLC, and Ryan Specialty Group Services, LLC (collectively, the Ryan Specialty Group).[4] In its supplemental petition, R&M alleged that WKF&C was a division, component, or subsidiary of the

---

[2] Cohen eventually pleaded guilty to various charges of wire fraud, identify theft, making false statements to an insurance regulator and obstruction of justice, and was sentenced to prison in December of 2015.

[3] The record here includes copies of proof of claims by R&M Mixed Beverage signed on December 30, 2014, by Raymond Chavez.

[4] As explained in more detail below, in April of 2012, months after the alleged car collisions that led to the Dram Shop suits, Ryan Services Group Underwriting Managers, LLC, a related entity, entered into an asset purchase agreement with WKF&C to purchase its assets as a going concern.

Ryan Specialty Group, and these entities provided insurance related services pertaining to the series of transactions that included Safe Harbor and USG, which led to R&M's purchase of the Indemnity insurance policy at issue in this case. R&M asserted a variety of allegations against the third-party defendants, contending that they had made misrepresentations and/or had failed to disclose material information with regard to R&M's purchase of the Indemnity policy; that they were negligent in their actions or omissions; and that they had engaged in violations of the Texas Deceptive Trade Practices Act (DTPA), and the Texas Insurance Code. After a period of discovery, the Ryan Specialty Group filed motions for summary judgment against all claims asserted by R&M. The trial court subsequently entered an order granting summary judgment in its entirety in favor of Ryan Specialty Group, LLC, and Ryan Specialty Group Services, LLC. Thereafter, USG and Safe Harbor filed traditional and no-evidence motions for summary judgment challenging all claims asserted against it. Issuing a final judgment, the trial court granted the motions for summary judgment filed by USG and Safe Harbor, which effectively disposed of all parties and all claims. This appeal followed.

## DISCUSSION

### STANDARD OF REVIEW

On appeal, we review a trial court's order granting both no-evidence and traditional motions for summary judgment *de novo*. *See Border Demolition & Envtl., Inc. v. Pineda*, 535 S.W.3d 140, 151 (Tex. App.—El Paso 2017, no pet.) (citing *Valence Operating Company v. Dorsett,* 164 S.W.3d 656, 661 (Tex. 2005); *see also Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). When, as here, a party has moved for summary judgment on both no-evidence and traditional grounds, we first review the no-evidence grounds. *See Cmty. Health Sys.*

6

*Prof'l Services Corp. v. Hansen*, 525 S.W.3d 671, 680 (Tex. 2017); *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).   If we conclude that the trial court properly granted the no-evidence summary judgment motion, we need not address the traditional motion to the extent that it addresses the same claims.   *See Lightning Oil Co.,* 520 S.W.3d at 45 (citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004)).

No-evidence motions for summary judgment are governed by Rule166a(i) of the Texas Rules of Civil Procedure, which requires a defendant to allege that adequate time for discovery has passed and that the plaintiff still has no evidence to support one or more essential elements of a claim for which the plaintiff would bear the burden of proof at trial.   *See Stierwalt v. FFE Transp. Services, Inc.,* 499 S.W.3d 181, 194 (Tex. App.—El Paso 2016, no pet.) (citing *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 79 (Tex. 2015)); TEX. R. CIV. P. 166a(i).   The motion must specifically state the elements as to which the movant contends there is no evidence. TEX. R. CIV. P. 166a(i); *see also Timpte Industries, Inc. v. Gish,* 286 S.W.3d 306, 310 (Tex. 2009); *Wade Oil & Gas, Inc. v. Telesis Operating Company, Inc.*, 417 S.W.3d 531, 540 (Tex. App.—El Paso 2013, no pet.).   The burden thereafter shifts to the non-movant to produce at least a scintilla of evidence to raise a genuine issue of material fact regarding each challenged element.   TEX. R. CIV. P. 166a(i); *see also Lightning Oil Co.,* 520 S.W.3d at 45; *Smith v. O'Donnell,* 288 S.W.3d 417, 424 (Tex. 2009); *Wade Oil & Gas*, 417 S.W.3d at 540.   More than a scintilla of evidence exists when reasonable and fair-minded individuals could differ in their conclusions.   *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). Although the nonmoving party is not required to marshal all of his proof in response to a summary judgment motion, he must present countervailing evidence that raises a genuine fact issue on the challenged elements.   *Duchene v. Hernandez*, 535

S.W.3d 251, 258 (Tex. App.—El Paso 2017, no pet.) (citing *Sw. Elec. Power Co. v. Grant,* 73 S.W.3d 211, 215 (Tex. 2002) (citing TEX. R. CIV. P. 166a)). The non-movant fails in their burden of creating a fact issue when the evidence is so weak as to do no more than create a mere surmise or suspicion of material fact. *Wade Oil & Gas*, 417 S.W.3d at 540; *see also Lozano v. Lozano*, 52 S.W.3d 141, 145 (Tex. 2001); *see also Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010).

A defendant may move for a traditional summary judgment at any time, with or without supporting affidavits, alleging that the plaintiff does not have evidence to support her claims. TEX. R. CIV. P. 166a. The defendant moving for traditional summary judgment bears the burden of proving there is no genuine issue of material fact as to at least one essential element of the plaintiff's cause of action, and that it is entitled to judgment as a matter of law. *Lightning Oil Co.*, 520 S.W.3d at 45 (citing TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017)); *see also Amedisys, Inc. v. Kingwood Home Health Care, LLC,* 437 S.W.3d 507, 511 (Tex. 2014). If the defendant meets that initial burden, the burden then shifts to the plaintiff to raise an issue of fact as to at least one of those elements, and in order to do so, it must come forward with more than a scintilla of evidence as to that element. *Amedisys, Inc.*, 437 S.W.3d at 511; *see also Chance v. Elliot & Lillian, LLC*, 462 S.W.3d 276, 283 (Tex. App.—El Paso 2015, no pet.); *Ciguero v. Lara*, 455 S.W.3d 744, 747 (Tex. App.—El Paso 2015, no pet.). However, if the defendant does not satisfy its initial burden, the burden does not shift and the plaintiff need not respond or present any evidence. *See Amedisys, Inc.,* 437 S.W.3d at 511; *see also State v. Ninety Thousand Two Hundred Thirty–Five Dollars and No Cents in U.S. Currency*

*($90,235)*, 390 S.W.3d 289, 292 (Tex. 2013) (citing *M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex. 2000) (per curiam)).

On appeal, whether we are reviewing the granting of a traditional or a no-evidence motion for summary judgment, we review the evidence in the light most favorable to the non-movant, crediting evidence favorable to that party if reasonable jurors could do so, and disregarding contrary evidence unless reasonable jurors could not. *Pineda*, 535 S.W.3d at 151 (citing *Mack Trucks, Inc. v. Tamez,* 206 S.W.3d 572, 582 (Tex. 2006); *see also Lightning Oil Co.*, 520 S.W.3d at 45. We further indulge every reasonable inference in favor of the non-movant, and resolve any doubts against the motion. *Lightning Oil Co.*, 520 S.W.3d at 45 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005)).

If the trial court's order does not specify the grounds on which the summary judgment was granted, "we must affirm the summary judgment if any of the theories presented to the trial court and preserved for appellate review are meritorious." *See Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 216 (Tex. 2003); *see also FM Properties Operating Co. v. City of Austin,* 22 S.W.3d 868, 872–73 (Tex. 2000) (citing *Star–Telegram, Inc. v. Doe,* 915 S.W.2d 471, 473 (Tex. 1995)).

**ISSUE ONE:  THE RYAN SPECIALTY GROUP'S
MOTION FOR SUMMARY JUDGMENT**

On April 1, 2012, an entity known as the RSG Underwriting Managers, LLC, entered into a purchase agreement, to purchase the assets of WKF&C. Thereafter, WKF&C voluntarily dissolved in 2013. Because of its inability to name WKF&C as a third-party defendant in the underlying lawsuit, R&M ultimately named the Ryan Specialty Group, i.e., Ryan Specialty Group Services, LLC, and Ryan Specialty Group, LLC, as third-party defendants, contending that

9

WKF&C had "merged" into and/or had been "acquired" by the two Ryan Specialty Group Defendants. R&M further contended that WKF&C was a "division, component or subsidiary of the Ryan Specialty Group" entities as referenced in the petition, and/or was an alter ego of the Ryan Specialty Group Defendants, and sought to hold them liable for WKF&C's conduct in procuring the Indemnity insurance policy on that basis.

Effective May 1, 2012, by means of an Instrument of Assumption included in the purchase agreement, another entity identified as WKFC Underwriting Managers, (WKFC), a series of RSG Underwriting Managers, LLC, assumed certain liabilities of the WKF&C companies, as assignee of RSG Underwriting Managers, LLC. The Instrument of Assumption, however, also expressly excluded all obligations of WKF&C, and its related entities, unless specifically stated.[5]

In their traditional motion for summary judgment seeking to dismiss this claim, the Ryan Specialty Group argued that they could not be held liable, as a matter of law, for the actions of WKF&C, as they were not involved in any of the transactions in question, they were not the actual parties to the Purchase Agreement, there was no merger between WKF&C and any of the Ryan Specialty Group entities, and none of the Ryan Specialty Group entities agreed to assume any liabilities for WKF&C's actions. To the contrary, the Ryan Specialty Group pointed out that the Purchase Agreement itself expressly stated that WKFC Underwriting Managers—an entity separate and apart from WKF&C—assumed specified liabilities of WKF&C's, including liabilities of the type under consideration herein.

---

[5] Throughout its brief, R&M refers to the entity WKFC as a successor in interest of Ryan Specialty Group and RSG Underwriting Managers, LLC. R&M asserts that, "[t]he WKFC business operation is currently housed in a series or subsidiary of RSG Underwriting Managers." R&M depicts the organizational chart for WKFC as showing Ryan Specialty Group overseeing RSG Underwriting Managers, LLC, which oversees WKFC.

In addition, the Ryan Specialty Group attached excerpts from a deposition given by their attorney, Ian Ackerman, as well as Ackerman's affidavit, stating that there was no merger between the various entities—as there was no exchange of shares and that it was instead, an arm's length transaction in which WKF&C's assets were sold for cash only. In addition, Ackerman stated that the various entities involved in the sale had no common ownership before the purchase, had no commingled funds, and that WKF&C's owners remained separate and discrete from any of the Ryan Specialty Group entities throughout the sale. The Ryan Specialty Group therefore argued that they could not be held liable on either an alter ego or a successor liability theory.

In response, R&M argued that a material issue of fact existed on the issue of whether WKF&C could have been held liable for Indemnity's fraudulent conduct, as WKF&C was acting as Indemnity's agent in the marketplace. R&M further contended that a question of fact existed on whether the Ryan Specialty Group's purchase of WKF&C was used as a sham to avoid liability for claims of this nature involving Indemnity. According to R&M, if in fact the acquisition was for the purpose of escaping liability, the Ryan Specialty Group should be held liable on that basis. R&M contended that the transaction described as a sale and acquisition was "nothing more than a shell game in which the assets, key employees, and operations of [WKF&C] were moved as a going concern into a new entity and where the litigation liabilities of [WKF&C] were left in a dormant entity and eventually done away with." R&M then concluded that for "legal and equitable reasons, the corporate fiction must be disregarded," and that the court should therefore treat WKFC, as successor of WKF&C, as either a "continuing entity or as having de facto merged" with the Ryan Specialty Group Services, LLC, and with the Ryan Specialty Group LLC, or collectively the "Ryan Defendants."

11

In reply, the Ryan Specialty Group supplemented their motion for summary judgment with excerpts from Ackerman's deposition testimony, in which he averred that the Ryan Defendants did not acquire WKF&C as part of any fraudulent scheme to defeat R&M's interests, stating that WKF&C did not share any concerns about Indemnity's financial stability at the time of the sale, and that he did not believe there was any cause for concern at the time of the sale in any event. In addition, the Ryan Specialty Group argued that there was no evidence that the various entities were alter egos of each other.

The trial court granted the motion for summary judgment of Ryan Specialty Group and ordered that R&M take nothing on their claims.

### *Arguments on Appeal*

On appeal, R&M argues that the trial court erred in granting the Ryan Defendants' traditional motion for summary judgment, asserting that there is a genuine issue of material fact as to whether they were WKFC's alter ego, and were therefore liable for WKFC's alleged "errors and omissions" in procuring the insurance policy through Indemnity.[6] R&M contends that the Ryan Defendants purchased WKFC's assets in a sham transaction so that WKFC could avoid liabilities. R&M further contends that the purchase was "nothing more than a shell game in which the assets, key employees, and operations of WKFC were moved as a going concern into a new entity and where the litigation liabilities of WKFC were left in a dormant entity and eventually done away with," asserting that the corporate "shell" entity that retained liabilities, i.e., WKFC Underwriting Managers, was "wound down and does not exist anymore." R&M contends that

---

[6] Because R&M's brief adopts WKF&C's successor entity's name of WKFC throughout its argument, we will do the same.

12

the Ryan Defendants used the "corporate structure" as a "sham to avoid liability based on WKFC's procurement of 'worthless' insurance." R&M contends that there is a genuine issue of material fact concerning whether WKFC could be considered the alter ego of the Ryan Defendants, and consequently "whether the corporate fiction of a corporate transaction should be disregarded."

R&M's argument fails for several reasons. First, as the Ryan Defendants point out, an entirely different corporate entity, RSG Underwriting Managers, LLC., acquired WKFC's assets pursuant to the Purchase Agreement, and the two Ryan Defendants were not named in the purchase agreement and were not involved in the purchase. Further, R&M fails to explain why it did not name Ryan Underwriting as a defendant, and why it instead chose to name the Ryan Specialty Group as defendants, other than to mention in passing that RSG Underwriting Managers is a subsidiary of the Ryan Specialty Group. Similarly, while R&M contends that we should find the Ryan Defendants liable for WKFC's actions, their reasoning also appears to be based on the contention that WKFC was a subsidiary of the Ryan Defendants, and/or that the Ryan Defendants and WKFC were operated as a single business enterprise, contending that the evidence demonstrated that they had overlapping finances and operations.

As a matter of law, however, none of these arguments serve as a basis for piercing the corporate veil. The fact that a corporation may be a parent of a subsidiary corporation does not automatically render it liable for the actions of its subsidiaries. For the purpose of legal proceedings, subsidiary corporations and parent corporations are considered "separate and distinct 'persons' as a matter of law, and the separate entity of corporations will generally be observed by the courts even where one company may dominate or control the other company, or treats the other company as a mere department, instrumentality, or agency." *See Formosa Plastics Corp., USA*

13

*v. Kajima Intern., Inc.,* 216 S.W.3d 436, 459–60 (Tex. App.—Corpus Christi 2006, pet. denied) (citing *Valero S. Tex. Processing Co. v. Starr County Appraisal Dist.,* 954 S.W.2d 863, 866 (Tex. App.—San Antonio 1997, pet. denied)); *see also Sitaram v. Aetna U.S. Healthcare of North Texas, Inc.,* 152 S.W.3d 817, 825 (Tex. App.—Texarkana 2004, no pet.) (courts presume that a parent corporation and its separate corporate subsidiary are distinct legal entities) (citing *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 798 (Tex. 2002)); *see also SSP Partners v. Gladstrong Investments (USA) Corp.,* 275 S.W.3d 444, 455 (Tex. 2008) (recognizing that the "[c]reation of affiliated corporations to limit liability while pursuing common goals lies firmly within the law and is commonplace"). Because a parent corporation generally has no duty to control its subsidiaries, courts will not disregard the corporate fiction and hold a parent corporation liable for the torts of its subsidiaries. *Lucas v. Texas Indus.,* 696 S.W.2d 372, 374 (Tex. 1984); *Bautista v. Trinidad Drilling Ltd.,* 484 S.W.3d 491, 498 (Tex. App.—Houston [1st Dist.] 2016, no pet.). And in the context of tort law, Texas courts have held that a parent corporation is not generally liable for the torts of its subsidiaries. *See Lucas*, 696 S.W.2d at 374 (because a parent corporation generally has no duty to control its subsidiaries, courts will not disregard the corporate fiction and hold a parent corporation liable for the torts of its subsidiaries); *see also Villanueva v. Astroworld, Inc.,* 866 S.W.2d 690, 695 (Tex. App.—Houston [1st Dist.] 1993, writ denied); *see also Abdel–Fattah v. PepsiCo, Inc.,* 948 S.W.2d 381, 383–84 (Tex. App.—Houston [14th Dist.] 1997, no writ); *Cleveland Reg'l Med. Ctr., L.P. v. Celtic Properties, L.C.,* 323 S.W.3d 322, 350–52 (Tex. App.—Beaumont 2010, pet. denied).

Thus, as the Texas Supreme Court has stated, it has "never held corporations liable for each other's obligations merely because of centralized control, mutual purposes, and shared finances."

14

*SSP Partners,* 275 S.W.3d at 455. Instead, there must also be evidence of "abuse, or . . . injustice and inequity" before one corporation may be held liable for another's obligations, or in other words, before a court will pierce the corporate veil to hold the parent company liable for its subsidiary's actions. *Id*; *see also Bautista*, 484 S.W.3d at 498 (in order to find a parent corporation liable for its subsidiary's actions, there must be some basis for piercing the corporate veil and treating the two corporations as one entity); *see also Alta Mesa Holdings, L.P. v. Ives,* 488 S.W.3d 438, 448 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (courts generally will not disregard the corporate fiction and hold a parent corporation liable for the obligations of a subsidiary unless something more is presented, such as evidence supporting an agency relationship or grounds for piercing the corporate veil); *Semperit Technische Produkte Gesellschaft M.B.H. v. Hennessy*, 508 S.W.3d 569, 585 (Tex. App.—El Paso 2016, no pet.) (noting that a subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock ownership, a duplication of some or all of the directors or officers, or an exercise of the control that stock ownership gives to stockholders) (citing *Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571, 573 (Tex. 1975)); *Cleveland Reg'l Med. Ctr., L.P.,* 323 S.W.3d at 350–52.

The Court has noted that these terms are "shorthand references for the kinds of abuse, specifically identified, that the corporate structure should not shield—fraud, evasion of existing obligations, circumvention of statutes, monopolization, criminal conduct, and the like," and expressly noted that these terms "do not mean a subjective perception of unfairness by an individual judge or juror[.]" *SSP Partners,* 275 S.W.3d at 455. Further, the Court has explained that "[s]uch abuse is necessary before disregarding the existence of a corporation as a separate entity," and that any "other rule would seriously compromise what we have called a 'bedrock

15

principle of corporate law'"—that a legitimate purpose for forming a corporation is to limit individual liability for the corporation's obligations. *Id.* (citing *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006) ("A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations.")).

In addition, we note that subsection (a)(2) of the Texas Business Organizations Code expressly states that a "holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any *affiliate* of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to . . . (2) any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory [emphasis added.]" TEX. BUS. ORGS. CODE ANN. § 21.223(a)(2); *see also TransPecos Banks v. Strobach,* 487 S.W.3d 722, 729-30 (Tex. App.—El Paso 2016, no pet.) (recognizing that the concept of piercing the corporate veil has been limited by statute). However, the Code does provide that this subsection does not "prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an *actual fraud* on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate [emphasis added.]" TEX. BUS. ORGS. CODE ANN. § 21.223(b). Although "actual fraud" is not statutorily defined, the term is construed by some courts for purposes of piercing the corporate veil, as involving "dishonesty of

16

purpose or intent to deceive."[7]   *See also U.S. KingKing, LLC v. Precision Energy Services, Inc.,* 555 S.W.3d 200, 212–13 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (citing *Tryco Enters., Inc. v. Robinson*, 390 S.W.3d 497, 508 (Tex. App.—Houston [1st Dist.] 2012, pet. dism'd); *TecLogistics, Inc. v. Dresser–Rand Grp., Inc.*, 527 S.W.3d 589, 598 (Tex. App.—Houston [14th Dist.] 2017, no pet.)).

Further, the Supreme Court has held that the "single business enterprise" liability theory is "fundamentally inconsistent with the approach taken by the Legislature in article 2.21."  *SSP Partners*, 275 S.W.3d at 456.   In other words, the fact that two corporations may have mingled their finances and assets will not be sufficient to pierce the corporate veil; instead, as set forth above, under the statute, there must be evidence that one of the corporations was using the other for the purpose of perpetrating an actual fraud.   *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.,* 299 S.W.3d 106, 116 (Tex. 2009) (one corporation's ownership of all or the majority of a second entity does not affect the second entity's existence as a distinct, separate legal entity) (citing *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 798 (Tex.

---

[7] This subsection has been interpreted to apply to LLC's, such as the various RRG entities, and has held that in order to pierce the corporate veil of an LLC, the plaintiff must prove that the defendant used the LLC to perpetrate an actual fraud for the defendant's direct personal benefit.   *See, e.g., Shook v. Walden,* 368 S.W.3d 604, 613-14, 621-22 (Tex. App.—Austin 2012, pet denied); *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 590–91 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (recognizing that the principles applicable to piercing the corporate veil apply equally to limited liability companies); *see also U.S. KingKing, LLC v. Precision Energy Services, Inc., 555* S.W.3d 200, 213 (Tex. App.—Houston [1st Dist.] 2018, no pet.); *AvenueOne Properties, Inc. v. KP5 Ltd. P'ship,* 540 S.W.3d 643, 649–50 (Tex. App.—Amarillo 2018, no pet.); TEX. BUS. ORGS. CODE ANN. § 101.002(a) (providing that section 21.223 of the Code relating to piercing the corporate veil applies to limited liability companies and their members). The principles applicable to piercing the corporate veil apply equally to limited liability companies. *McCarthy v. Wani Venture, A.S.*, 251 S.W.3d 573, 590–91 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *see* TEX. BUS. ORGS. CODE ANN. § 101.002(a) (providing that section 21.223 applies to limited liability companies and their members except to the extent the company agreement provides otherwise as provided in section 101.114).

2002); *Lucas*, 696 S.W.2d at 374; *Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571, 573 (Tex. 1975); *Bell Oil & Gas Co. v. Allied Chem. Corp.,* 431 S.W.2d 336, 337 (Tex. 1968)).

In the present case, there is no evidence that the Ryan Defendants sought to utilize either RSG Underwriting Managers and/or WKFC entities to perpetrate an actual fraud on R&M. As explained above, there is no evidence that the Ryan Defendants were aware of Indemnity's financial instability at the time RSG purchased WKFC's assets, nor that Indemnity would later experience a forced liquidation. To the contrary, the record demonstrates that at the time of the purchase, Indemnity had retained an A- rating and had remedied capitalization concerns raised by regulators and the rating agency. Although issues arose, Indemnity's rating was not downgraded until September 24, 2013—a year and a half after the asset purchase of April 2012. Further, the Delaware Insurance Commissioner did not institute proceedings against Indemnity until July 26, 2013, well over a year after that purchase took place. As well, attorney Ackerman testified that WKFC did not share any concerns about the financial stability of Indemnity at the time of the sale, and he did not believe that they had any reason to have any concerns.

The evidence therefore does not support a finding that the Ryan Defendants used WKFC to perpetrate an actual fraud on R&M with respect to Indemnity's financial situation, i.e., that the Purchase Agreement was made with the intent to deceive or defeat R&M's claims. As such, we find no basis in the record for finding the Ryan Defendants liable for WKFC's actions, and we therefore conclude that the trial court properly granted the Ryan Defendants' motion for summary judgment. *See AvenueOne Properties, Inc. v. KP5 Limited Partnership*, 540 S.W.3d 643, 650 (Tex. App.—Amarillo 2018, no pet.) (reversing trial court's judgment where evidence was legally insufficient to support finding that commercial tenant's president caused tenant, a corporation, to

18

be used for purpose of perpetrating and did perpetrate actual fraud on landlord primarily for president's direct personal benefit, as was statutorily required to pierce corporate veil).   R&M's Issue One is overruled.

## ISSUE TWO:   THE NEGLIGENCE, DTPA AND INSURANCE CODE CLAIMS AGAINST USG AND SAFE HARBOR

In its second issue on appeal, R&M argues that the trial court erred in granting USG and Safe Harbor's motions for summary judgment on its claims for negligence, and for violations of the DTPA and the Insurance Code.   We view each of these claims separately.

The elements of a claim for negligence include a duty, a breach of the duty, causation and damages. *Praesel v. Johnson,* 967 S.W.2d 391, 394 (Tex. 1998) (a cause of action for negligence has three elements: "1) a legal duty; 2) a breach of that duty; and 3) damages proximately resulting from the breach").   If one element of negligence has been conclusively negated, it is proper for a trial court to grant summary judgment in favor of the defendant. *Willis v. Marshall*, 401 S.W.3d 689, 700 (Tex. App.—El Paso 2013, no pet.) (citing *Frost Nat. Bank v. Fernandez,* 315 S.W.3d 494, 509 (Tex. 2010).   The threshold question in any such case is whether a duty exists, and that question is a question of law for a court to decide.   *Willis,* 401 S.W.3d at 700 (citing *Joseph E. Seagram & Sons, Inc. v. McGuire,* 814 S.W.2d 385, 387 (Tex. 1991)).   If no duty exists, then our inquiry into liability will quickly end, and we will affirm a trial court's granting of summary judgment on that basis.   *Id*. (citing *Van Horn v. Chambers,* 970 S.W.2d 542, 544 (Tex. 1998)).

In the present case, R&M contends that both USG and Safe Harbor both owed it an array of important professional duties, which they breached.   We review each alleged duty and breach separately.

### 1.  The Duty of Procuring Insurance with an Authorized Insurer

19

R&M first contends that Safe Harbor and USG owed it a duty to procure insurance with an "authorized insurer," citing to TEX. INS. CODE ANN. § 101.201 and contending that Safe Harbor and USG violated this provision by procuring insurance through Indemnity. The Code provision provides as follows: "An insurance contract effective in this state and entered into by an unauthorized insurer is unenforceable by the insurer. A person who in any manner assisted directly or indirectly in the procurement of the contract is liable to the insured for the full amount of a claim or loss under the terms of the contract if the unauthorized insurer fails to pay the claim or loss." *Id*. § 101.201(a). By express terms of the Code, the Legislature recognizes that "(a) It is a state concern that many residents of this state hold insurance policies issued by persons or insurers who are not authorized to do insurance business in this state and who are not qualified as eligible surplus lines insurers under Chapter 981. These residents face often insurmountable obstacles in asserting legal rights under the policies in foreign forums under unfamiliar laws and rules of practice." *Id*. § 101.001(a). Although RRG's are not mentioned in this Code provision, RRG's are nevertheless expressly authorized by statute to conduct insurance business in Texas, and such groups are regulated under Chapter 2201 of the Texas Insurance Code. *Id*. § 2201.001. In particular, qualified RRG's are expressly authorized to provide the following: "(1) liability insurance for assuming and spreading all or any portion of the liability of the group's members; and (2) reinsurance with respect to the liability of another risk retention group, or a member of that group, engaged in businesses or activities that meet the requirements of section 2201.055(a) for membership in the group providing reinsurance." *Id.* § 2201.056(a).

The undisputed summary judgment evidence established that when R&M first purchased the liquor liability policy from Indemnity, and after its renewal, Indemnity remained qualified to

act as an RRG in the State of Texas. The evidence submitted includes a letter from the Texas Department of Insurance certifying that Indemnity was "registered as a foreign risk retention group under the laws of Chapter 2201, Texas Insurance code, from October 23, 2008 through November 14, 2013."

Accordingly, we find no support for R&M's argument that Indemnity was not authorized to sell insurance in the State of Texas, and/or that either USG or Safe Harbor violated their duties under the Texas Insurance Code by procuring insurance from Indemnity on R&M's behalf.

### 2. The Duty to Use Reasonable Diligence in Attempting to Place the Requested Insurance Coverage

R&M next argues that USG and Safe Harbor had a "duty to use reasonable diligence in attempting to place the requested insurance and to inform Mavericks if unable to do so," which it allegedly breached. The line of cases cited by R&M, however, involve situations in which customers interested in insurance coverage were wrongly led to believe that they were being insured against a particular risk, as requested by the customer, when in fact the customers were either not issued a policy at all, and/or the policy they were issued did not cover the risk in question. *See, e.g.*, *May v. United Services Association of America*, 844 S.W.2d 666, 669 (Tex. 1992) (citing *Burroughs v. Bunch*, 210 S.W.2d 211 (Tex. App.—El Paso 1948, writ ref'd); *Scott v. Conner*, 403 S.W.2d 453 (Tex. App.—Beaumont 1966, no writ)); *see also Powell v. Narried,* 463 S.W.2d 43, 45 (Tex. App.—El Paso 1971, writ ref'd n.r.e.) (recognizing that "an insurance agent has a duty to his client not to advise the client that he is covered by insurance if he is, in fact, not so covered."); *McNeill v. McDavid Ins. Agency,* 594 S.W.2d 198, 203 (Tex. App.—Fort Worth 1980, no writ) (it is well settled that if an applicant's agent agrees to secure insurance for the applicant, but fails to

21

do so, the agent has the duty to inform the applicant that no insurance has been secured) (citing *Burroughs v. Bunch*, 210 S.W.2d 211 (Tex. App.—El Paso 1948, writ ref'd)).

In contrast, in the present case, R&M was provided with the type of insurance coverage it requested, i.e., a liquor liability policy issued by Indemnity with risk disclosures included, which covered the particular risk it had sought coverage for, that is, protection against claims brought under the Dram Shop Act. In fact, after suit was filed against R&M, Indemnity initially provided coverage, which initially included attorneys retained to assist in the defense of the case. The fact that Indemnity later became insolvent does not change the fact that at all times prior to the date of R&M's loss, a valid liquor liability policy had existed and that R&M had been informed of the coverage and nature of the risk associated with contracting with an RRG. As such, we conclude that there is no evidence that either USG or Safe Harbor failed to procure the requested insurance on behalf of R&M.

### 3. The Duty to Exercise Due Diligence to Ensure the "Solvency and Legitimacy of the Carrier Offering the Insurance"

R&M's next argument appears to be at the heart of its belief that USG and Safe Harbor were negligent in procuring the liquor liability policy from Indemnity. R&M alleges that USG and Safe Harbor had a duty to exercise due diligence in the form of a "basic security review," to ensure Indemnity's "solvency and legitimacy" as an insurance carrier, and that they breached that duty by failing to adequately investigate Indemnity's financial condition before recommending that R&M obtain coverage through Indemnity. In support of its argument, R&M cites a line of cases in which customers were told by insurance agents that they were covered under an insurance policy that was issued by companies that were already insolvent at the time the policies were issued, or that became insolvent before the date of the customer's loss. *See, e.g.*, *Hancock v.*

22

*Wilson,* 173 S.W. 1171 (Tex. App.—Dallas 1915, no writ) (defendant insurance agents, who were operating an unincorporated insurance association which they knew was insolvent could be held personally liable for a loss under a policy they issued to the plaintiff). We of course acknowledge that if an insurance agent procured a policy from a company known by the agent to be insolvent either before the policy's procurement or at some point before a loss occurred, and the agent did nothing to try to protect his insured's interest, this could render the agent potentially liable to the customer. *See, e.g., Diamond v. Duncan,* 107 Tex. 256, 172 S.W. 1100 (1915) (upholding agent's liability where the agent became aware of the insurance company's insolvency shortly after procuring a policy, but did nothing to protect his insured's interests); *see also Higginbotham & Associates, Inc. v. Greer,* 738 S.W.2d 45, 47 (Tex. App.—Texarkana 1987, writ denied) (noting that liability has been imposed on an agent who placed his customer with insurance from a company he knew was insolvent from the outset) (citing *Hancock v. Wilson,* 173 S.W. 1171 (Tex. App.—Dallas 1915, no writ).

These cases, however, are inapposite to the present situation. In the present case, there is no evidence that either USG or Safe Harbor knew that Indemnity was facing insolvency and/or that Indemnity's president had committed fraud at the time the policy was purchased, at the time it was renewed, and/or at any time prior to the date of R&M's loss in September of 2011. To the contrary, as set forth above, at all relevant times, Indemnity maintained an A- rating from A.M. Best for at least the following two years; the issues pertaining to Indemnity's financial instability did not become apparent until A.M. Best downgraded its rating in September of 2013. Further, the Delaware Insurance Commissioner had not taken any action against Indemnity until July of 2013, when it first filed a petition against Indemnity asserting that its financial condition had

deteriorated to such a degree that current and further transaction of insurance as a going concern remained hazardous to policyholders.

R&M, however, believes that there were certain "red flags" that occurred earlier—prior to the date of R&M's loss—which should have alerted USG and Safe Harbor to Indemnity's precarious financial condition and negative rating outlook while there was still time to obtain different coverage. R&M finds it significant that, in December of 2009, A.M. Best reported concerns over Indemnity's capitalization when a letter of credit was withdrawn from the company's balance sheet, causing a downgrade of its rating to a "B-." The record reveals, however, that Indemnity successfully appealed the rating downgrade after it agreed it would infuse capital into the company. Mr. Cohen promised he would transfer ten million dollars to boost the company's capital. After infusion of this additional capital, A.M. Best upgraded Indemnity's rating to an "A-," and it remained at that level until September of 2013. As this situation was remedied well before R&M's loss occurred, this seemingly temporary downgrade of rating would not have alerted either Safe Harbor or USG of a high risk of insolvency, or to the possibility of fraud occurring up to four years later.

Next, R&M points out that in 2006, there was a negative regulatory report on Indemnity from the District of Columbia Department of Insurance Securities and Banking (DISB), the state agency having regulatory jurisdiction over Indemnity given its domicile in the District. DISB noted that Indemnity had issues with its capitalization structure; however, these issues were remedied by Indemnity pursuant to a Consent Agreement. No further information indicated that the problems identified in the report were not addressed, or that Indemnity's situation as it existed

24

in 2007 would have alerted anyone to the issues that occurred over seven years later when Indemnity became insolvent.

Similarly, R&M points to a report on Indemnity from DISB that was adopted as final on August 20, 2010. This report chronicled the financial issues that Indemnity faced with the withdrawal of the letter of credit discussed above, but also noted that Cohen had infused the company with the above-described capital to address the situation. The report also chronicled some of the other issues that it perceived with respect to such matters as Indemnity writing policies in excess of approved limits, but the report also indicated that these issues were also addressed in the Department-approved Consent Agreement with Cohen. The report also made several recommendations regarding Indemnity's policy-writing practices and recommended that it generally "perform a review of its underwriting and policy issuance system" including the adequacy of the controls within the system. However, the report concluded that Indemnity's "capital and surplus funds exceeded the minimum requirements during the period under examination," and there was no indication that DISB intended to take any further action against Indemnity.

As well, the record indicates that Indemnity responded to DISB's report, by either refuting the findings and/or agreeing to perform a review of its procedures. In turn, DISB expressly found Indemnity's response to be "adequate" with respect to the financial issues and recommendations that had been made. In short, there is nothing in the record to suggest that DISB intended to take any action against Indemnity, conduct any additional investigations, or that it otherwise considered Indemnity unfit to continue providing insurance at that time. As such, there is nothing in the

25

report that would have suggested to either USG or Safe Harbor that Indemnity had not adequately responded to regulators as needed.

R&M also contends that Indemnity's own brochures, which it supplied to USG and Safe Harbor at the time R&M purchased its policies, contained certain "red flags" which should have alerted USG and Safe Harbor to the fact that Indemnity was overstating its financial stability. R&M contends that the brochure stated that Indemnity had assets in excess of some of the country's leading insurance companies, which, in effect, R&M believes USG and Safe Harbor should have known was not true. As well, R&M contends that USG and Safe Harbor should have known that Indemnity's "pricing and product details were unusually aggressive," and "unusually good for customers," in comparison to other liquor liability carriers, which R&M apparently believes "were too good to be true," and should have made them realize that Indemnity was not a legitimate carrier. R&M's arguments, however, are highly speculative in nature with regard to how Indemnity's representations were, or should have been, interpreted by USG and Safe Harbor; again, during the time Indemnity made these claims there was no evidence that they were false, and we do not believe that this type of information would cause a reasonable insurance agent and/or a wholesale broker to believe that Indemnity would face financial collapse years in the future.

And finally, R&M points out that at least two lawsuits were filed against Indemnity in 2011 and 2012 in D.C.—two of which were filed shortly before the date of loss herein in February or March of 2011—in which parties were claiming that Indemnity had refused to pay claims, and/or that Indemnity had engaged in fraud. R&M apparently believes that USG and Safe Harbor should

26

have been aware of these lawsuits and inferred from their existence that Indemnity was not a reliable carrier.

There are several problems with this argument. First, we know of no case law, and R&M has cited none, that would require an insurance agent or wholesale broker to be aware of and/or monitor lawsuits pending throughout the country with respect to each and every carrier they have utilized for their customers. To the contrary, we believe that requiring an agent and/or wholesale broker to do so would place an undue burden on them absent controlling legal authority. More importantly, we note that while these two lawsuits were filed approximately six months before the date of R&M's loss, there is no evidence that they were resolved before then—in other words, there was no evidence that a judgment had been entered against Indemnity in either of those cases, or that any findings had been made to the effect that Indemnity had wrongfully refused to pay any claims or that it had engaged in fraudulent conduct—in other words, at that point in time, the lawsuits contained nothing but allegations that had not yet been proven. As such, we conclude that the filing of these lawsuits would not support a finding that either USG or Safe Harbor either knew or should have known that Indemnity was facing potential insolvency prior to R&M's date of loss.[8]

---

[8] We note that R&M also argues that after it became apparent that Indemnity was in trouble financially, Safe Harbor and USG should have advised R&M to settle their case promptly. We note, however, that neither an insurance agent nor an underwriter is in a position to provide their customers with legal advice, and instead, that responsibility fell on the lawyers that Indemnity hired to represent R&M in the Dram Shop litigation. *See generally Unauthorized Practice of Law Comm. v. Am. Home Assur. Co., Inc.*, 261 S.W.3d 24, 33 (Tex. 2008) (recognizing that a corporation, including a corporation engaged in the business of providing insurance, is not authorized to engage in the practice of law, but that it may employ staff attorneys to represent the interests of its customers as part of its duty to defend in a lawsuit). As such, we fail to see how either USG or Safe Harbor could be held liable for failing to provide legal advice to R&M with regard to any potential settlement in the case.

In various other cases, courts around the country have concluded that an insurance agent is not liable for a customer's lost claim due to the insurer's insolvency "if the insurer is solvent at the time the policy is procured, unless at that time or at a later time when the insured could be protected, the agent knows or by the exercise of reasonable diligence should know, of facts or circumstances which would put a reasonable agent on notice that the insurance presents an unreasonable risk." *Higginbotham & Associates, Inc. v. Greer*, 738 S.W.2d 45, 47 (Tex. App.—Texarkana 1987, writ denied) (citing *Master Plumbers Limited Mutual Liability Co. v. Cormany & Bird, Inc.,* 79 Wis.2d 308, 255 N.W.2d 533 (1977); *Williams-Berryman Ins. Co. v. Morphis,* 249 Ark. 786, 461 S.W.2d 577 (1971); *see also, Kane Ford Sales, Inc. v. Cruz,* 119 Ill.App.2d 102, 255 N.E.2d 90 (1970); *Sternoff Metals Corp. v. Vertecs Corp.,* 39 Wash.App. 333, 693 P.2d 175 (1984)).  Thus, in a similar situation, our sister court reversed a jury's verdict finding an insurance agent liable for his customer's loss due to the insurer's insolvency, where there was no evidence that the agent had actual knowledge of an insurer's financial instability and/or that he reasonably should have known that the coverage would represent an unreasonable risk, either at the time of purchase or prior to the customer's loss. *Higginbotham*, 738 S.W.2d at 47.  The court in that case found it significant that the insurer was registered in Texas, and that the insurer had a B+ rating from A.M. Best the year before the policy issued, which was considered "very good," and was paying its claims promptly at that time. *Id.* at 47-48.  Further, the customer's own expert testified that there was nothing inappropriate with placing a customer with an insurer with a B+ rating, and that although the insurer had obtained a higher rate in the past, it had been rated at B+ for at least four years in a row, which was a sign of stability. *Id*. at 48.  The court also noted that the customer expressly agreed to the coverage and selected the insurance that he wanted. *Id*.

28

Having found no evidence to support the jury's finding of negligence, the court found that the evidence was factually insufficient to support liability. *Id*.

As in *Higginbotham*, we conclude that R&M presented less than a scintilla of evidence to support its claim that either USG or Safe Harbor were negligent in placing insurance coverage with Indemnity. There is simply no evidence that USG or Safe Harbor knew or reasonably should have known that Indemnity would face financial collapse at the time the policy was purchased and/or at any time prior to the date of loss.

### 4. Safe Harbor's Duty to Inform R&M that Indemnity was an RRG, and to Explain the Risks Associated with Purchasing a Policy from an RRG

R&M next contends that Safe Harbor owed it a duty to inform R&M that Indemnity was an RRG, and to explain the risks associated with purchasing a policy from an RRG, citing primarily to section 2201.206 of the Texas Insurance Code. In addressing this issue, we note that this Code provision expressly provides that:

> Any policy issued by a risk retention group must contain in 10-point type on the front page and on the declarations page the following notice:

> This policy is issued by your risk retention group. Your risk retention group may not be subject to all of the insurance laws and regulations of your state. State insurance insolvency guaranty funds are not available for your risk retention group.

TEX. INS. CODE ANN. § 2201.206. In the present case, the undisputed evidence demonstrates that policies issued by Indemnity to R&M contained the requisite notice, including the policy that was issued in December of 2010 that was in existence at the time of R&M's loss. As such, we find, as a matter of law, that this Insurance Code provision was not violated.[9]

---

[9] At various times in the trial court, Richard Chavez claimed that he did not receive a copy of the policy. However, Chavez admitted in his deposition that he may have directed Weir to "go ahead and send it to my mom." The fact

29

R&M contends, however, that Safe Harbor had a duty to personally explain to R&M, and Richard Chavez in particular, the risks associated with purchasing insurance from an RRG, and that Safe Harbor failed in this regard.[10]   R&M points to Chavez's deposition testimony in which he asserted that Safe Harbor's agent, Victoria Weir, did not fully explain to him the true nature of an RRG, or the risks inherent in purchasing the Indemnity policy, and that he had no understanding of such.   R&M contends that this evidence raises a question of fact regarding whether Safe Harbor breached its duty in this regard.

As a preliminary matter, we agree that in general, an agent who is working on behalf of an applicant has a duty to either explain the terms of the application form, or otherwise inform the applicant of the nature and scope of coverages included in the application.   *See generally McNeill v. McDavid Ins. Agency*, 594 S.W.2d 198, 203 (Tex. App.—Fort Worth 1980, no writ); *Riggs v. Sentry Ins.,* 821 S.W.2d 701, 705 (Tex. App.—Houston [14th Dist.] 1991, writ denied) (affirming jury instruction that the agent has a duty to explain the terms of the application to the client).   In the present case, however, despite Chavez's testimony to the contrary, the record contains undisputed evidence establishing that when Safe Harbor first placed coverage with R&M in December of 2008, Safe Harbor sent R&M a letter advising it that it was proposing to place its

---

that Chavez did not review the policy does not take away from the fact that the policies contained the requisite notice and were sent to the location that R&M requested.

[10] We note that R&M does not include USG in this argument, apparently recognizing that the undisputed evidence established that it is the insurance agent and not the wholesale broker or underwriter that is required to communicate with the customer. *See, e.g., N. Am. Shipbuilding, Inc. v. S. Marine & Aviation Underwriting, Inc.,* 930 S.W.2d 829, 836 (Tex. App.—Houston [1st Dist.] 1996, no writ) (underwriter had no duty to the applicant to explain the terms of and coverages included in the application); *see also Riggs v. Sentry Ins.,* 821 S.W.2d 701, 705 (Tex. App.—Houston [14th Dist.] 1991, writ denied); *McNeill v. McDavid Ins. Agency*, 594 S.W.2d 198, 203 (Tex. App.—Fort Worth 1980, no writ); *Hudspeth v. Enter. Life Ins. Co.,* 358 S.W.3d 373, 391 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

coverage with an RRG and explaining that an RRG is a "non-traditional market." More importantly, it then obtained a written disclaimer signed by Richard Chavez and dated December 18, 2008, acknowledging receipt of Safe Harbor's letter, and acknowledging that he understood the risk disclosed including the warning that the proposed coverage was "not subject to the protection and benefits of the state guaranty associations[.]" As such, we conclude that the undisputed summary judgment evidence belies R&M's contention that it was not informed of the true nature of the risk associated with contracting with an RRG, and/or that it was not aware of the fact that an RRG does not participate in the guaranty fund.

### 5. Whether Safe Harbor or USG violated any provision of Chapter 981 of the Texas Insurance Code

R&M next contends that Safe Harbor and USG violated two provisions in Chapter 981 of the Texas Insurance Code, regarding an agent's duty to obtain declinations from admitted carriers prior to procuring insurance from a non-admitted carrier, citing to TEX. INS. CODE ANN. §§ 981.001 and 981.004. Chapter 981 of the Code, however, relates solely to surplus line carriers, and not to RRG's, and are therefore not applicable to the present case. *See* TEX. INS. CODE ANN. § 981.001(c)(recognizing that the purpose of Chapter 981 is to regulate and tax surplus lines insurance carriers).

Further, R&M has not cited any other statutory or case law imposing a similar duty on agents to obtain declinations from admitted carriers prior to procuring insurance from an RRG. As such, we conclude, as a matter of law, that neither Safe Harbor nor USG violated these Code provisions.

### 6. Alleged Misrepresentations and Deceptive Practices

31

And finally, R&M contends that USG and Safe Harbor could be held liable for making misrepresentations and engaging in deceptive practices, in violation of both the DTPA and the Texas Insurance Code when placing R&M's coverage with Indemnity.[11]  R&M contends that USG and/or Safe Harbor made at least three misrepresentations regarding Indemnity's policy.

First, R&M contends that Appellees falsely stated that they were "selling liquor liability insurance that was actually not insurance, but rather, merely a ticket into a Ponzi scheme that collapsed[.]"  And second, in a related argument, R&M contends that Appellees falsely stated that its "premium payments would be used to purchase insurance, which was false[.]"  These contentions, however, are wholly without merit.  As discussed above, Indemnity was a registered RRG in the State of Texas and was authorized to provide liquor liability insurance at the time of R&M's initial purchase and at the time of each policy renewal.  Further, at the time of purchase and renewal, R&M's premium payments did in fact go toward the purchase of liquor liability insurance from Indemnity; the fact that Indemnity later became insolvent does not change the fact that R&M did in fact purchase and pay premiums for a valid liquor liability policy at the time in question.

Second, R&M contends that Appellees stated that "they sold only 'A rated' policies when in fact the Indemnity policy at issue was 'A-minus' rated and had negative reports issued."  This, however, is contradicted by the record.  The undisputed evidence established that Safe Harbor

---

[11] The elements of a negligent-misrepresentation cause of action consist of:  (1) defendant's representation to a plaintiff in the course of defendant's business or in a transaction in which the defendant had an interest; (2) defendant's providing false information for the guidance of others; (3) defendant's failure to exercise reasonable care or competence in obtaining or communicating information; (4) plaintiff's justifiable reliance on defendant's representation; and (5) defendant's negligent misrepresentation proximately causing the plaintiff's injury.  *Miller v. LandAmerica Lawyers Title of El Paso,* 362 S.W.3d 842, 845 (Tex. App.—El Paso 2012, no pet.); *Willis v. Marshall,* 401 S.W.3d 689, 698–99 (Tex. App.—El Paso 2013, no pet.).

32

expressly advised R&M in writing that Indemnity had an A-minus rating, and in response, Richard Chavez acknowledged in writing that he had been given that information. And more importantly, even R&M had been told that Indemnity had an "A-" rating, rather than an "A" rating, R&M does not explain how this could have resulted in any harm to them. As set forth above, an A- rating is considered "excellent," and the fact that Indemnity had a slightly lower rating was in no way the cause of the damages that R&M suffered when Indemnity later became insolvent.

Third, R&M contends that Appellees generally misrepresented the nature of the policy and/or failed to disclose information concerning the true nature of the policy, in violation of the DTPA. Again, the record contains no evidence that Appellees misrepresented the nature of the liquor liability policy that they procured from Indemnity, and/or made any misrepresentations about Indemnity's status as an RRG. To the contrary, as set forth above, Richard Chavez signed a written disclaimer indicating that he understood he was receiving a policy through an RRG, and that he understood that the "coverage written [was] not subject to the protection and benefits of the state guaranty associations[.]" And, once again, we note that the policy itself contained a notice stating that: "Insurance Insolvency guaranty funds are not available for your risk retention group."

Accordingly, we conclude that the record does not contain a scintilla of evidence to support any of R&M's claims against Appellees for negligence, and/or its claim that Appellees committed any violations of the DTPA or the Texas Insurance Code. We therefore hold that the trial court properly granted summary judgment in favor of Appellees. R&M's Issue Two is overruled.

**ISSUE THREE: WHETHER THE TRIAL COURT ERRED BY STRIKING R&M'S EXPERT WITNESS AFFIDAVIT**

33

R&M next contends that the trial court erred by striking the expert witness affidavit of George Biehl prior to ruling on Appellees' motions for summary judgment. We disagree.

As we recently noted, an expert witness must meet the basic qualification requirements found in TEX. R. EVID. 702, which provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702; *see Johnson v. Harris*, 546 S.W.3d 293, 299–300 (Tex. App.—El Paso 2017, no pet.). The trial court serves a gatekeeper function to assure that the witness truly has expertise concerning the "actual subject about which they are offering an opinion." *Johnson*, 546 S.W.3d at 299–300 (citing *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006) (citing *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 719 (Tex. 1998))). The focus is on whether the expert has the knowledge, skill, experience, training, or education regarding the specific issue before the court which qualifies the expert to give an opinion on that very subject. *Id.* (citing *In re Commitment of Bohannan*, 388 S.W.3d 296, 305 (Tex. 2012)).

We review a trial court's decision to strike an expert for an abuse of discretion. *See Johnson*, 546 S.W.3d at 300–01 (citing *Broders*, 924 S.W.2d at 151); *Chester v. El–Ashram*, 228 S.W.3d 909, 912 (Tex. App.—Dallas 2007, no pet.); *see also State v. Petropoulos*, 346 S.W.3d 525, 529 (Tex. 2011) (trial court has broad discretion to determine the admissibility of expert witness testimony). A trial court does not abuse its discretion simply because we would have ruled differently, or because we conclude the trial court committed a mere error in judgment. *Johnson*, 546 S.W.3d at 300 (citing *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d

34

549, 558 (Tex. 1995)).   Rather, the test for abuse of discretion is "whether the trial court acted without reference to any guiding rules or principles."   *Id.*

In its brief, R&M contends that Biehl was qualified to serve as an expert witness; however, R&M does not address the question of whether Biehl's testimony would have been helpful to a jury, which would have served as an independent basis for the trial court's decision to strike his testimony.   In the present case, we need not consider the issue of whether Biehl was qualified as an expert because we conclude that his testimony would not have helped the trier of fact to understand the evidence or to determine a fact in issue.   In his affidavit, Biehl expressed several opinions about duties and responsibilities owed by Safe Harbor and USG to R&M.   However, as set forth above, the question of what duties Safe Harbor and USG owed to R&M are questions of law for a court to decide and not questions of fact for a jury.   Moreover, although Biehl concluded that Safe Harbor and USG violated those duties, the evidence belies his conclusions. Accordingly, we conclude that R&M has failed in its burden of establishing that the trial court abused its discretion in striking Biehl's testimony.   R&M's Issue Three is overruled.

## ISSUE FOUR:   WHETHER THE TRIAL COURT ERRED IN SUSTAINING OBJECTIONS TO THE BLUMENFELD EXHIBITS

In its fourth issue on appeal, R&M contends that the trial court erred by striking the affidavit of Robert Blumenfeld, together with 22 exhibits that were attached to his affidavit. These exhibits included excerpts from testimony given at Jeffery Cohen's criminal trial, which detailed his fraudulent conduct with regard to Indemnity, from the start of his tenure; various documents pertaining to DISB's report, as referenced above; and documents from various court cases that were filed against Indemnity in 2011.   R&M contends that these documents were relevant because they established that Indemnity was structured merely as a "Ponzi scheme."

Whether to admit or exclude evidence is within the trial court's sound discretion. *Morale v. State*, 557 S.W.3d 569, 573 (Tex. 2018) (citing *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)). Irrelevant evidence is not admissible. *Id.* (citing TEX. R. EVID. 402). Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." *Id.* (citing TEX. R. EVID. 401).

In the present case, as explained above, however, none of these items had any bearing on whether USG and Safe Harbor knew or should have known that Indemnity was financially unstable or that it was being operated fraudulently by Cohen. As such, we conclude that the trial court properly struck the affidavit of Robert Blumenfeld and its accompanying exhibits. R&M's Issue Four is overruled.

### ISSUE FIVE: WHETHER THERE WAS EVIDENCE THAT R&M COULD HAVE PURCHSED OTHER LIQUOR LIABILITY POLICIES

In its final issue on appeal, R&M contends that in the trial court, Safe Harbor and USG contended that R&M failed to establish that there were other policies available that R&M could have purchased instead of the policy it purchased from Indemnity. We note, however, that the question of whether R&M could have purchased other policies or not does not weigh in our decision with regard to whether Safe Harbor or USG committed negligence and/or whether they violated the DTPA or the Texas Insurance Code. As set forth above, the record established, as a matter of law, that neither USG nor Safe Harbor were negligent in procuring the policy from Indemnity on R&M's behalf, as Indemnity was, at the time, financially solvent and registered to operate as an RRG in the State of Texas. As well, the record established as a matter of law that Safe Harbor adequately warned R&M about the true nature and risks of purchasing an RRG policy,

and the record belies R&M's contention that it did not understand or was otherwise misled by either Safe Harbor or USG. Therefore, the question of whether R&M could have purchased alternative liquor liability insurance is simply not relevant to our inquiry. R&M's Issue Five is overruled.

## CONCLUSION

The trial court's ruling granting summary judgment is affirmed.


June 12, 2019                                        GINA M. PALAFOX, Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.